## CLEVELAND *v.* UNITED STATES

No. 99–804.   Argued October 10, 2000—Decided November 7, 2000

GINSBURG, J., delivered the opinion for a unanimous Court.

*Paul Mogin* argued the cause for petitioner. With him on the briefs were *Robert B. Barnett* and *Joseph G. Petrosinelli.*

*Deputy Solicitor General Dreeben* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Robinson, Barbara McDowell,* and *Joel M. Gershowitz.*\*

---

\**Lisa Kemler* and *Ellen S. Podgor* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

Briefs of *amici curiae* were filed for the Chamber of Commerce of the United States by *Robin S. Conrad, Carter G. Phillips, Richard D. Bernstein,* and *Joseph S. Miller;* and for Samsung Electronics Co. by *Richard L. Stanley, Cecilia H. Gonzalez, David J. Healey,* and *Lisa S. McCalmont.*

JUSTICE GINSBURG delivered the opinion of the Court.

This case presents the question whether the federal mail fraud statute, 18 U. S. C. § 1341, reaches false statements made in an application for a state license. Section 1341 proscribes use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Petitioner Carl W. Cleveland and others were prosecuted under this federal measure for making false statements in applying to the Louisiana State Police for permission to operate video poker machines. We conclude that permits or licenses of this order do not qualify as "property" within § 1341's compass. It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim. State and municipal licenses in general, and Louisiana's video poker licenses in particular, we hold, do not rank as "property," for purposes of § 1341, in the hands of the official licensor.

I

Louisiana law allows certain businesses to operate video poker machines. La. Rev. Stat. Ann. §§ 27:301 to 27:324 (West Supp. 2000). The State itself, however, does not run such machinery. The law requires prospective owners of video poker machines to apply for a license from the State. § 27:306. The licenses are not transferable, § 27:311(G), and must be renewed annually, La. Admin. Code, tit. 42, § 2405(B)(3) (2000). To qualify for a license, an applicant must meet suitability requirements designed to ensure that licensees have good character and fiscal integrity. La. Rev. Stat. Ann. § 27:310 (West Supp. 2000).

In 1992, Fred Goodson and his family formed a limited partnership, Truck Stop Gaming, Ltd. (TSG), in order to participate in the video poker business at their truck stop in Slidell, Louisiana. Cleveland, a New Orleans lawyer, as-

sisted Goodson in preparing TSG's application for a video poker license. The application required TSG to identify its partners and to submit personal financial statements for all partners. It also required TSG to affirm that the listed partners were the sole beneficial owners of the business and that no partner held an interest in the partnership merely as an agent or nominee, or intended to transfer the interest in the future.

TSG's application identified Goodson's adult children, Alex and Maria, as the sole beneficial owners of the partnership. It also showed that Goodson and Cleveland's law firm had loaned Alex and Maria all initial capital for the partnership and that Goodson was TSG's general manager. In May 1992, the State approved the application and issued a license. TSG successfully renewed the license in 1993, 1994, and 1995 pursuant to La. Admin. Code, tit. 42, § 2405(B)(3) (2000). Each renewal application identified no ownership interests other than those of Alex and Maria.

In 1996, the Federal Bureau of Investigation (FBI) discovered evidence that Cleveland and Goodson had participated in a scheme to bribe state legislators to vote in a manner favorable to the video poker industry. The Government charged Cleveland and Goodson with multiple counts of money laundering under 18 U. S. C. § 1957, as well as racketeering and conspiracy under § 1962. Among the predicate acts supporting these charges were four counts of mail fraud under § 1341.[1] The indictment alleged that Cleveland and

---

[1] Title 18 U. S. C. § 1341 provides in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails or causes them to be used], shall be fined under this title or imprisoned not more than five years, or both." The Racketeer Influenced and Corrupt Organizations Act (RICO) prohibits participation and conspiracy to participate in a pattern of "racketeering activity," 18 U. S. C. §§ 1962(c), (d), and defines "racketeering activity" to include "any act which is indictable under ... section

Goodson had violated § 1341 by fraudulently concealing that they were the true owners of TSG in the initial license application and three renewal applications mailed to the State. They concealed their ownership interests, according to the Government, because they had tax and financial problems that could have undermined their suitability to receive a video poker license. See La. Rev. Stat. Ann. § 27:310(B)(1) (West Supp. 2000) (suitability requirements).

Before trial, Cleveland moved to dismiss the mail fraud counts on the ground that the alleged fraud did not deprive the State of "property" under § 1341. The District Court denied the motion, concluding that "licenses constitute property even before they are issued." 951 F. Supp. 1249, 1261 (ED La. 1997). A jury found Cleveland guilty on two counts of mail fraud (based on the 1994 and 1995 license renewals) and on money laundering, racketeering, and conspiracy counts predicated on the mail fraud. The District Court sentenced Cleveland to 121 months in prison.

On appeal, Cleveland again argued that Louisiana had no property interest in video poker licenses, relying on several Court of Appeals decisions holding that the government does not relinquish "property" for purposes of § 1341 when it issues a permit or license. See *United States* v. *Shotts*, 145 F. 3d 1289, 1296 (CA11 1998) (license to operate a bail bonds business); *United States* v. *Schwartz*, 924 F. 2d 410, 418 (CA2 1991) (arms export license); *United States* v. *Granberry*, 908 F. 2d 278, 280 (CA8 1990) (school bus operator's permit); *Toulabi* v. *United States*, 875 F. 2d 122, 125 (CA7 1989) (chauffeur's license); *United States* v. *Dadanian*, 856 F. 2d 1391, 1392 (CA9 1988) (gambling license); *United States* v.

---

1341," § 1961(1). The money laundering statute prohibits various activities designed to conceal or promote "specified unlawful activity," § 1956, and defines "specified unlawful activity" to include (with an exception not relevant here) "any act or activity constituting an offense listed in section 1961(1) of this title," § 1956(c)(7)(A).

*Murphy,* 836 F. 2d 248, 254 (CA6 1988) (license to conduct charitable bingo games).

The Court of Appeals for the Fifth Circuit nevertheless affirmed Cleveland's conviction and sentence, *United States* v. *Bankston,* 182 F. 3d 296, 309 (1999), considering itself bound by its holding in *United States* v. *Salvatore,* 110 F. 3d 1131, 1138 (1997), that Louisiana video poker licenses constitute "property" in the hands of the State. Two other Circuits have concluded that the issuing authority has a property interest in unissued licenses under § 1341. *United States* v. *Bucuvalas,* 970 F. 2d 937, 945 (CA1 1992) (entertainment and liquor license); *United States* v. *Martinez,* 905 F. 2d 709, 715 (CA3 1990) (medical license).

We granted certiorari to resolve the conflict among the Courts of Appeals, 529 U. S. 1017 (2000), and now reverse the Fifth Circuit's judgment.

## II

In *McNally* v. *United States,* 483 U. S. 350, 360 (1987), this Court held that the federal mail fraud statute is "limited in scope to the protection of property rights." *McNally* reversed the mail fraud convictions of two individuals charged with participating in "a self-dealing patronage scheme" that defrauded Kentucky citizens of "the right to have the Commonwealth's affairs conducted honestly." *Id.,* at 352. At the time *McNally* was decided, federal prosecutors had been using § 1341 to attack various forms of corruption that deprived victims of "intangible rights" unrelated to money or property.[2] Reviewing the history of § 1341, we concluded that "the original impetus behind the mail fraud statute was

---

[2] *E. g., United States* v. *Clapps,* 732 F. 2d 1148, 1153 (CA3 1984) (electoral body's right to fair elections); *United States* v. *Bronston,* 658 F. 2d 920, 927 (CA2 1981) (client's right to attorney's loyalty); *United States* v. *Bohonus,* 628 F. 2d 1167, 1172 (CA9 1980) (right to honest services of an agent or employee); *United States* v. *Isaacs,* 493 F. 2d 1124, 1150 (CA7 1974) (right to honest services of public official).

to protect the people from schemes to deprive them of their money or property." *Id.*, at 356.

As first enacted in 1872, § 1341 proscribed use of the mails to further "'any scheme or artifice to defraud.'" *Ibid.* In 1896, this Court held in *Durland* v. *United States*, 161 U. S. 306, 313, that the statute covered fraud not only by "representations as to the past or present," but also by "suggestions and promises as to the future." In 1909, Congress amended § 1341 to add after "any scheme or artifice to defraud" the phrase "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *McNally*, 483 U. S., at 357. We explained in *McNally* that the 1909 amendment "codified the holding of *Durland*," *ibid.*, and "simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property," *ibid.* Rejecting the argument that "the money-or-property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property," *id.*, at 358, we concluded that the 1909 amendment signaled no intent by Congress to "depar[t] from [the] common understanding" that "the words 'to defraud' commonly refer 'to wronging one in his property rights,'" *id.*, at 358–359 (quoting *Hammerschmidt* v. *United States*, 265 U. S. 182, 188 (1924)).

Soon after *McNally*, in *Carpenter* v. *United States*, 484 U. S. 19, 25 (1987), we again stated that § 1341 protects property rights only. *Carpenter* upheld convictions under § 1341 and the federal wire fraud statute, 18 U. S. C. § 1343, of defendants who had defrauded the Wall Street Journal of confidential business information. Citing decisions of this Court as well as a corporate law treatise, we observed that "[c]onfidential business information has long been recognized as property." 484 U. S., at 26.

The following year, Congress amended the law specifically to cover one of the "intangible rights" that lower courts had

protected under § 1341 prior to *McNally:* "the intangible right of honest services." Anti-Drug Abuse Act of 1988, § 7603(a), 18 U. S. C. § 1346. Significantly, Congress covered only the intangible right of honest services even though federal courts, relying on *McNally,* had dismissed, for want of monetary loss to any victim, prosecutions under § 1341 for diverse forms of public corruption, including licensing fraud.[3]

### III

In this case, there is no assertion that Louisiana's video poker licensing scheme implicates the intangible right of honest services. The question presented is whether, for purposes of the federal mail fraud statute, a government regulator parts with "property" when it issues a license. For the reasons we now set out, we hold that § 1341 does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not "property" in the government regulator's hands. Again, as we said in *McNally,* "[i]f Congress desires to go further, it must speak more clearly than it has." 483 U. S., at 360.

To begin with, we think it beyond genuine dispute that whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is *regulatory.* Louisiana recognizes the importance of "public confidence and trust that gaming activities . . . are conducted honestly

---

[3] For example, in *United States* v. *Murphy,* 836 F. 2d 248, 254 (CA6 1988), the court overturned the mail fraud conviction of a state official charged with using false information to help a charitable organization obtain a state bingo license. Acknowledging "the *McNally* limitations" on § 1341, the court said that the issue "distills to a consideration of whether Tennessee's 'right to control or object' with respect to the issuance of a bingo permit to a charitable organization constitutes 'property.'" *Id.,* at 253. It then held that "the certificate of registration or the bingo license may well be 'property' once issued, insofar as the charitable organization is concerned, but certainly an unissued certificate of registration is not property of the State of Tennessee and once issued, it is not the property of the State of Tennessee." *Id.,* at 253–254.

and are free from criminal and corruptive elements." La. Rev. Stat. Ann. § 27:306(A)(1) (West Supp. 2000). The video poker licensing statute accordingly asserts the State's "legitimate interest in providing strict regulation of all persons, practices, associations, and activities related to the operation of . . . establishments licensed to offer video draw poker devices." *Ibid.* The statute assigns the Office of State Police, a part of the Department of Public Safety and Corrections, the responsibility to promulgate rules and regulations concerning the licensing process. § 27:308(A). It also authorizes the State Police to deny, condition, suspend, or revoke licenses, to levy fines of up to $1,000 per violation of any rule, and to inspect all premises where video poker devices are offered for play. §§ 27:308(B), (E)(1). In addition, the statute defines criminal penalties for unauthorized use of video poker devices, § 27:309, and prescribes detailed suitability requirements for licensees, § 27:310.

In short, the statute establishes a typical regulatory program. It licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization. In this regard, it resembles other licensing schemes long characterized by this Court as exercises of state police powers. *E. g., Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132, 138 (1939) (license to transport alcoholic beverages); *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 558 (1917) (license to sell corporate stock); *Fanning* v. *Gregoire,* 16 How. 524, 534 (1854) (ferry license); *License Cases,* 5 How. 504, 589 (1847) (license to sell liquor) (opinion of McLean, J.), overruled on other grounds, *Leisy* v. *Hardin,* 135 U. S. 100 (1890).

Acknowledging Louisiana's regulatory interests, the Government offers two reasons why the State also has a property interest in its video poker licenses. First, the State receives a substantial sum of money in exchange for each license and continues to receive payments from the licensee as long as the license remains in effect. Second, the State

has significant control over the issuance, renewal, suspension, and revocation of licenses.

Without doubt, Louisiana has a substantial economic stake in the video poker industry. The State collects an upfront "processing fee" for each new license application, La. Rev. Stat. Ann. § 27:311(H)(2) (West Supp. 2000) ($10,000 for truck stops), a separate "processing fee" for each renewal application, § 27:311(H)(4) ($1,000 for truck stops), an "annual fee" from each device owner, § 27:311(A)(4) ($2,000), an additional "device operation" fee, § 27:311(A)(5)(c) ($1,000 for truck stops), and, most importantly, a fixed percentage of net revenue from each video poker device, § 27:311(D)(1)(b) (32.5% for truck stops). It is hardly evident, however, why these tolls should make video poker licenses "property" in the hands of the State. The State receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only *after* they have been issued to licensees. Licenses pre-issuance do not generate an ongoing stream of revenue. At most, they entitle the State to collect a processing fee from applicants for new licenses. Were an entitlement of this order sufficient to establish a state property right, one could scarcely avoid the conclusion that States have property rights in any license or permit requiring an upfront fee, including drivers' licenses, medical licenses, and fishing and hunting licenses. Such licenses, as the Government itself concedes, are "purely regulatory." Tr. of Oral Arg. 24–25.

Tellingly, as to the character of Louisiana's stake in its video poker licenses, the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law. Indeed, there is no dispute that TSG paid the State of Louisiana its proper share of revenue, which totaled more than $1.2 million, between 1993 and 1995. If Cleveland defrauded the State of "property," the nature of that property cannot be economic.

Addressing this concern, the Government argues that Cleveland frustrated the State's right to control the issuance, renewal, and revocation of video poker licenses under La. Rev. Stat. Ann. §§ 27:306, 27:308 (West Supp. 2000). The Fifth Circuit has characterized the protected interest as "Louisiana's right to choose the persons to whom it issues video poker licenses." *Salvatore*, 110 F. 3d, at 1140. But far from composing an interest that "has long been recognized as property," *Carpenter*, 484 U. S., at 26, these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate. Notably, the Government overlooks the fact that these rights include the distinctively sovereign authority to impose criminal penalties for violations of the licensing scheme, La. Rev. Stat. Ann. § 27:309 (West Supp. 2000), including making false statements in a license application, § 27:309(A). Even when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor. Such regulations are paradigmatic exercises of the States' traditional police powers.

The Government compares the State's interest in video poker licenses to a patent holder's interest in a patent that she has not yet licensed. Although it is true that both involve the right to exclude, we think the congruence ends there. Louisiana does not conduct gaming operations itself, it does not hold video poker licenses to reserve that prerogative, and it does not "sell" video poker licenses in the ordinary commercial sense. Furthermore, while a patent holder may sell her patent, see 35 U. S. C. § 261 ("patents shall have the attributes of personal property"), the State may not sell its licensing authority. Instead of a patent holder's interest in an unlicensed patent, the better analogy is to the Federal Government's interest in an unissued patent. That interest, like the State's interest in licensing video poker operations,

surely implicates the Government's role as sovereign, not as property holder. See U. S. Const., Art. I, §8, cl. 8.

The Government also compares the State's licensing power to a franchisor's right to select its franchisees. On this view, Louisiana's video poker licensing scheme represents the State's venture into the video poker business. Although the State could have chosen to run the business itself, the Government says, it decided to franchise private entities to carry out the operations instead. However, a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market. Louisiana's authority to select video poker licensees rests on no similar asset. It rests instead upon the State's sovereign right to exclude applicants deemed unsuitable to run video poker operations. A right to exclude in that governing capacity is not one appropriately labeled "property." See Tr. of Oral Arg. 25. Moreover, unlike an entrepreneur or business partner who shares both losses and gains arising from a business venture, Louisiana cannot be said to have put its labor or capital at risk through its fee-laden licensing scheme. In short, the State did not decide to venture into the video poker business; it decided typically to permit, regulate, and tax private operators of the games.

We reject the Government's theories of property rights not simply because they stray from traditional concepts of property. We resist the Government's reading of §1341 as well because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress. Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities. We note in this regard that Louisiana's video poker statute typically and unambiguously imposes criminal penalties for making false statements on license applications. La. Rev. Stat. Ann. §27:309(A)

(West Supp. 2000). As we reiterated last Term, "'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Jones* v. *United States*, 529 U. S. 848, 858 (2000) (quoting *United States* v. *Bass*, 404 U. S. 336, 349 (1971)).

Moreover, to the extent that the word "property" is ambiguous as placed in § 1341, we have instructed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States*, 401 U. S. 808, 812 (1971). This interpretive guide is especially appropriate in construing § 1341 because, as this case demonstrates, mail fraud is a predicate offense under RICO, 18 U. S. C. § 1961(1) (1994 ed., Supp. IV), and the money laundering statute, § 1956(c)(7)(A). In deciding what is "property" under § 1341, we think "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 222 (1952).

Finally, in an argument not raised below but urged as an alternate ground for affirmance, the Government contends that § 1341, as amended in 1909, defines two independent offenses: (1) "any scheme or artifice to defraud" and (2) "any scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Because a video poker license is property in the hands of the licensee, the Government says, Cleveland "obtain[ed] . . . property" and thereby committed the second offense even if the license is not property in the hands of the State.

Although we do not here question that video poker licensees may have property interests in their licenses,[4] we never-

---

[4] Notwithstanding the State's declaration that "[a]ny license issued or renewed . . . is not property or a protected interest under the constitutions of either the United States or the state of Louisiana," La. Rev. Stat. Ann. § 27:301(D) (West Supp. 2000), "[t]he question whether a state-law right

theless disagree with the Government's reading of § 1341. In *McNally*, we recognized that "[b]ecause the two phrases identifying the proscribed schemes appear in the disjunctive, it is arguable that they are to be construed independently." 483 U. S., at 358. But we rejected that construction of the statute, instead concluding that the second phrase simply modifies the first by "ma[king] it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." *Id.*, at 359. Indeed, directly contradicting the Government's view, we said that "the mail fraud statute . . . had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to *the Government's interests as property holder." Id.*, at 359, n. 8 (emphasis added). We reaffirm our reading of § 1341 in *McNally*. See *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 205 (1991) ("*stare decisis* is most compelling" where "a pure question of statutory construction" is involved). Were the Government correct that the second phrase of § 1341 defines a separate offense, the statute would appear to arm federal prosecutors with power to police false statements in an enormous range of submissions to state and local authorities. For reasons already stated, see *supra*, at 24–25, we decline to attribute to § 1341 a purpose so encompassing where Congress has not made such a design clear.

## IV

We conclude that § 1341 requires the object of the fraud to be "property" in the victim's hands and that a Louisiana

---

constitutes 'property' or 'rights to property' is a matter of federal law," *Drye* v. *United States*, 528 U. S. 49, 58 (1999) (citing *United States* v. *National Bank of Commerce*, 472 U. S. 713, 727 (1985)). In some contexts, we have held that individuals have constitutionally protected property interests in state-issued licenses essential to pursuing an occupation or livelihood. See, *e. g.*, *Bell* v. *Burson*, 402 U. S. 535, 539 (1971) (driver's license).

video poker license in the State's hands is not "property" under §1341. Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States. Our holding means that Cleveland's §1341 conviction must be vacated. Accordingly, the judgment of the United States Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*