UNITED STATES of America,

v.

Omar ALKAABI, a/k/a Omar Al-kaabi.

United States of America,

v.

Tarik I. Alsugair.

Criminal Action Nos. 02–370, 02–395.

United States District Court,
D. New Jersey.

Sept. 23, 2002.

Thomas Abbenante, Esq., Washington, DC, for Defendant, Omar Alkaabi, a/k/a Omar Al-kaabi.

Paul J. Fishman, Esq., Karin McEwen, Esq., Friedman Kaplan Seiler & Adelman LLP, Newark, NJ, for Defendant, Tarik I. Alsugair.

Christopher J. Christie, Esq., United States Attorney, George S. Leone, Esq., Assistant United States Attorney, Andrew Leven, Esq., Assistant United States Attorney, Amy S. Winkelman, Esq., Assistant United States Attorney, Newark, NJ, for the United States of America.

Lawrence S. Lustberg, Esq., Thomas R. Valen, Esq., Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, for Amicus Curiae, the Royal Embassy of Saudi Arabia.

## OPINION

ORLOFSKY, District Judge.

These cases present a novel question of law under the federal mail fraud statute, 18 U.S.C. § 1341 (2002). Specifically, does an alleged scheme to deprive the Educational Testing Service, Inc. ("ETS") of an "interest in maintaining the integrity of the testing process" constitute a deprivation of property, within the meaning of the mail fraud statute? For the reasons discussed below, I conclude that ETS's alleged property interest is not a traditional property interest cognizable under the mail fraud statute. Accordingly, I shall grant the motions of Defendants, Omar Alkaabi ("Alkaabi"), a/k/a Omar Al-kaabi, and Tarik L. Alsugair ("Alsugair"), to dismiss the Indictments.

## I. BACKGROUND

The Test of English as a Foreign Language, commonly known as the TOEFL, is administered by ETS, a New Jersey corporation that designs and administers

standardized exams.[1] *See* Alkaabi and Alsugair Indictments ("Indicts.")[2] ¶ 1(A). Many schools and colleges throughout the United States require foreign students to pass the TOEFL examination as a condition of admission to their academic programs. *Id.*

The Indictments charge each Defendant with conspiracy to violate the federal mail fraud statute, in violation of 18 U.S.C. § 371 (2002), and with the substantive charge of mail fraud, in violation of 18 U.S.C. § 1341 (2002).[3] The Government alleges that Alkaabi and Alsugair each violated these criminal statutes by having an imposter take and pass the TOEFL on his behalf. *See* Indicts., Count I, ¶¶ 2,6. In each case, the imposter appeared at a test site and identified himself as the student who had to take the exam. *Id.* ¶¶ 3,7. The imposter, posing as the student, had his photo taken at the test site, sat for the TOEFL exam, and directed that the exam results be mailed to a predetermined location. *Id.* Once the test results arrived, the real student's photograph was substituted for the imposter's photograph, *id.*, and the fraudulent TOEFL exam results were then mailed to schools requiring the real student's exam results in a phony ETS envelope. *Id.* ¶ 3.

There are approximately sixty criminal cases pending in the District of New Jersey that charge Arab or Moslem defendants with fraud in connection with the TOEFL examination. *See Amicus* Br. at

1. The defendants in these TOEFL cases are all students taking undergraduate or graduate courses at colleges and universities in the United States. *Id.*

## II. DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT

### A. Legal Standard Governing Motions to Dismiss Under Fed.R.Crim.P. 12(b)

Alkaabi and Alsugair each move, pursuant to Fed.R.Crim.P. 12(b) (West 2002), to dismiss their respective Indictments.[4] Fed.R.Crim. P. 12 provides, in relevant part, that "[a]ny defense, objection or request which is capable of determination without the trial of the general issue may be raised before trial by motion." *Id.* "Defenses and objections based on defects in the indictment or information" must be raised prior to trial. Fed.R.Crim.P. 12(b).

The Government correctly asserts that Alkaabi and Alsugair cannot move to dismiss their Indictments to assert a premature challenge to the sufficiency of the Government's evidence. As the Third Circuit has previously held, "[u]nless there is a stipulated record, or unless immunity issues are implicated, a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir.2000). Alkaabi and Alsugair, however, are not challenging the sufficiency of the evidence to be presented against them at trial.[5] Rather, they challenge the

---

1. ETS also develops and administers the well-known Scholastic Aptitude Test (SAT) given to high school students for college admission purposes. *See Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 535–36 (3d Cir.1986).

2. *See* App. A, *infra*, for the full text of the Indictment against Alkaabi. The Indictment against Alsugair contains virtually identical language and structure.

3. The Government also charges Alkaabi with aiding and abetting under 18 U.S.C. § 2.

4. Although these two cases have not been consolidated, the Indictments contain virtually identical allegations against Alkaabi and Alsugair. Given the commonality of the legal issues presented, in the interests of judicial economy, these motions have been briefed and argued orally together. They have not been consolidated for any other purpose.

5. Indeed, at oral argument defense counsel conceded as much. Thus, for the purposes of these motions to dismiss only, the Defendants

facial sufficiency of the allegations contained in the Indictments brought against them. *Id.* at 661.

The Government argues that the charges as alleged in the Indictments withstand Alkaabi's and Alsugair's motions to dismiss because the Indictments track the language of the mail fraud statute, 18 U.S.C. § 1341 (2001). Gov't Brs. at 9.[6] Unfortunately, the Government has completely ignored the holding of *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir.2002), a case decided earlier this year. In *Panarella*, Chief Judge Becker wrote:

> We are thus constrained to reject the government's contention that an indictment or information charges an offense, for purposes of Rule 12(b)(2), as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements. Instead, we hold that, for purposes of Rule 12(b)(2), a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.

*Id.*[7] It is clear that the Third Circuit's decision in *Panarella*, not *DeLaurentis*, is controlling in these cases. Thus, I must determine whether the facts as alleged in the Indictments adequately allege the elements of mail fraud under 18 U.S.C. § 1341. Contrary to the Government's assertion, *DeLaurentis* is no bar to this undertaking. In these cases, unlike *DeLaurentis*, this Court is not considering a motion to dismiss the Indictments "on the basis of predictions as to what the trial evidence will be." *Id.*, 230 F.3d at 661.

**B. The "Property" Element of 18 U.S.C. § 1341**

The mail fraud statute, 18 U.S.C. § 1341 (West 2002), provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or *for obtaining money or property* by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter ... shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* (emphasis added).

The United States Supreme Court has explained that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *McNally v. United States*, 483 U.S. 350, 356, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Although the statute contains disjunctive language,

concede that the Government can prove what is alleged in the Indictments.

**6.** This argument is made on the same page of both briefs, largely identical, submitted by the Government in each of these cases.

**7.** At oral argument, Assistant United States Attorney George Leone asserted that *Panarella* was overruled in part by *United States v. Cotton*, —— U.S. ——, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). The issue presented in *Cotton*, however, was "whether the omission from a federal indictment of a fact that enhances the statutory maximum sentence justi-

fies a court of appeals' vacating the enhanced sentence, even though the defendant did not object in the trial court." *Id.* at 1783. The Supreme Court ultimately concluded that omissions from an Indictment do not deprive a court of jurisdiction, and then proceeded to apply the plain-error test of 'Fed.R.Crim.P. 52(b) to the defendants' forfeited claim on appeal. To the extent that *Panarella* was overruled by *Cotton* regarding whether a 12(b)(2) claim can be asserted on appeal without having been raised in the trial court, it does not otherwise affect *Panarella's* holding set forth above.

*McNally* made it clear that 18 U.S.C. § 1341 does not reach any "scheme or artifice to defraud," *id.*, but is "limited in scope to the protection of property rights." *McNally*, 483 U.S. at 358–60, 107 S.Ct. 2875; *see also Cleveland v. United States*, 531 U.S. 12, 19, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (1909 amendment to Section 1341 signaled no intent by Congress to depart from the common understanding that the words "to defraud" commonly refer to wronging one in his property rights).

In *McNally*, the Supreme Court held that the mail fraud statute did not reach "the intangible right of the citizenry to good government." *See id.*, 483 U.S. at 356, 107 S.Ct. 2875.[8] *McNally*, however, did not broadly limit the scope of § 1341 to tangible as distinguished from intangible property rights. *See Carpenter v. United States*, 484 U.S. 19, 25, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). In fact, in the same year it decided *McNally*, the Supreme Court applied 18 U.S.C. § 1341 to intangible property rights in *Carpenter*, 484 U.S. at 25, 28, 108 S.Ct. 316, a case in which it held that confidential business information, which the defendant had compiled for a *Wall Street Journal* investment column, was within the ambit of the mail and wire fraud statutes.[9] *Id.* The *Carpenter* Court explained that "[c]onfidential business information has long been recognized as property." *Id.* at 26, 108 S.Ct. 316 (citations omitted).

## C. ETS's Alleged Property Interest in the TOEFL

### 1. "Maintaining the Integrity of the Testing Process"

The issue before this court is whether the "property" element of the mail fraud statute, 18 U.S.C. § 1341, encompasses an alleged scheme to deprive ETS of any property interest in "maintaining the integrity of its testing process." Indicts. ¶ I(A). "For purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Cleveland*, 531 U.S. at 15, 121 S.Ct. 365. Thus, I must determine whether ETS, the alleged victim in these cases, was deprived of any property as a result of the alleged TOEFL scheme.

Not content to rely on the language of the Indictments, the Government advances in its brief three alternative forms of ETS's property interest: (1) ETS's copyrighted test and trademarked score sheet; (2) ETS's administration and scoring services; and (3) ETS's goodwill based on the integrity of its testing process. Gov't Brs. at 11. Curiously, however, the Indictments only allege ETS's interest in "maintaining the integrity of the testing process," Indicts. ¶ I(A), as the property interest of which ETS was deprived under 18 U.S.C. § 1341. The Government did not include its three alternative property theories in the Indictments presented to the Grand Jury, and it cannot do so now.[10] This is because "a court cannot permit a

---

8. In response to the Supreme Court's decision in *McNally*, Congress passed 18 U.S.C. § 1346 (West 2002), which makes "a scheme or artifice to deprive another of the intangible right of honest services" punishable under the mail fraud statute. *Id.* The Government has not alleged any violation of § 1346 in these Indictments.

9. The mail and wire fraud statutes share the same relevant language, and the same legal analysis applies to both statutes. *See Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

10. I express no view regarding whether the Indictments in these cases would withstand motions to dismiss had the Government included these alternative theories in the language of the Indictments.

defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Zauber*, 857 F.2d 137, 144 (3d Cir.1988) ("It is settled law that nothing can be added to an indictment without the concurrence of the grand jury by which the bill was found.") (citation omitted). Indeed, *United States v. Schramm*, 75 F.3d 156 (3d Cir.1996), eloquently sets forth the reasons why such meticulous attention must be paid to the language contained in the Indictments:

> The principle that an indictment must contain the essential elements of the offense charged is premised upon three distinct constitutional commands which we cannot ignore. First, the indictment must be sufficiently precise to inform the defendant of the charges against which he or she must defend, as required by the Sixth amendment. Second, the indictment must enable an individual to determine whether he or she may plead a prior acquittal or conviction to bar future prosecutions for the same offense, in accordance with the Fifth Amendment.... Third, the purpose of an indictment is to shield a defendant in a federal felony case from unfounded prosecutorial charges and to require him to defend in court only those allegations returned by an independent grand jury, as provided by the Fifth Amendment.... By sufficiently articulating the critical elements of the underlying offense, an indictment insures that the accused has been duly charged by the grand jury upon a proper finding of probable cause, and will be convicted only on the basis of facts found by that body.

*Id.* at 162–63 (citations and internal quotations omitted).

The Government cannot usurp the role of the grand jury by advancing new, unalleged theories of property in its briefs in an effort to save the Indictments. Accordingly, I shall address only the property interest alleged in the Indictments. *Accord United States v. Henry*, 29 F.3d 112, 114 (3d Cir.1994) (rejecting property theories that were not alleged in Indictment for mail fraud); *Zauber*, 857 F.2d at 143–44 (rejecting "goodwill" theory of property that was not alleged in Indictments for mail and wire fraud).

### 2. Traditional Property Rights

 In analyzing the question of what is a property right within the meaning of the mail fraud statute, I do not write on a clean slate. "[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right." *Henry*, 29 F.3d at 115.

In *Henry*, the United States Court of Appeals for the Third Circuit held that a fair bidding opportunity between competing banks was not a property right encompassed by the mail fraud statute. *Id.* at 116. The Indictment in *Henry* alleged corruption by public officials in the process of selecting a bank to be the repository of the Delaware River Joint Toll Bridge Commission's toll bridge revenues.[11] However, the Indictment did not focus on either the Commission's or the public's property rights, but rather on the competing banks' rights. *Henry*, 29 F.3d at 114. The Government argued that the defendants defrauded the banks of an intangible property right—namely, a fair opportunity to bid to receive the Commission's funds. *Id.* The Third Circuit affirmed the District Court's dismissal of the Indictment. because a fair bidding opportunity was not a

---

**11.** The alleged fraudulent events in *Henry* occurred before Congress extended the mail fraud statute to include the intangible right of honest services under 18 U.S.C. § 1346.

traditionally recognized, enforceable property right. *Id.* at 116.

The Indictments against Alkaabi and Alsugair fail for the same reason as did the Indictment in *Henry*. "Maintaining the integrity of the testing process" is not a traditionally recognized, enforceable property right. This Court recognizes the importance that ETS places on maintenance of the integrity of its TOEFL testing process. Reliable and accurate test results are certainly valuable to ETS. The existence of such value, however, does not transform ETS's interest in "maintaining the integrity of the testing process" into a property right, just as a fair bidding opportunity was valuable to the banks in *Henry*, but was not recognized as a property interest under the mail fraud statute.

██ ETS's alleged property interest lacks two of the hallmarks of traditional property—exclusivity and transferability. Exclusivity is an important aspect of traditional property. *Henry*, 29 F.3d at 115; *Carpenter*, 484 U.S. at 26–27, 108 S.Ct. 316; *see also College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) ("The hallmark of a protected property interest is the right to exclude others."). ETS does not have an exclusive right in the integrity of the TOEFL testing process. All the institutions that rely on the TOEFL results share an interest in the integrity of the TOEFL examination, and the Indictments in these cases allege that many schools, colleges and universities rely on the integrity of the TOEFL results. *See* Indicts.

¶ I(A). Thus, ETS's integrity interest is not exclusive to ETS.

██ Another traditional hallmark of property is transferability. *See Boss Co. v. Bd. of Com'rs of City of Atlantic City*, 40 N.J. 379, 385, 192 A.2d 584, 587 (1963) ("qualities of property" include monetary value and transferability).[12] Although many institutions rely on the TOEFL results, ETS's interest in maintaining the integrity of its TOEFL testing process is unique to ETS and cannot be sold, traded or assigned on the open market. Unlike the valuable confidential business information in *Carpenter*, which was the exclusive property of the *Wall Street Journal* and of great value to investors, there is no market for maintaining the integrity of the TOEFL examination, which is administered by ETS alone. The Government's argument that ETS could sell its assets and goodwill only highlights the ethereal nature of the property interest alleged in these cases-indeed, it is difficult to imagine how ETS's interest in "maintaining the integrity of the testing process" could be apportioned or valued in the same manner as ETS's trademark or copyright interests, two forms of intangible intellectual property that are recognized as traditional property rights and protected by statute.[13]

The Government has cited no case that recognizes the maintenance of the integrity of a testing process as a traditional property right. Thus, like the integrity of the bidding process in *Henry*, the integrity of the testing process alleged in these cases is not a property right encompassed by the mail fraud statute.[14] The Indict-

---

12. In determining whether the law has traditionally recognized a property right, federal courts may look to state courts for guidance. *See, e.g., Cleveland v. United States*, 531 U.S. 12, 23–24, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (analyzing state law to assess alleged property interest in gaming licenses); *United States v. Antico*, 275 F.3d 245, 262–64 (3d Cir.2001) (analyzing state law to determine

scope of public employee's obligations in honest services fraud case).

13. *See* 17 U.S.C. § 101 (2002), *et seq.* (copyrights); 15 U.S.C. § 1051 (2002), *et seq.* (trademarks).

14. I recognize that the goodwill of a business is a valid property right. *See College Savings*

ments against Alkaabi and Alsugair join the ranks of other federal cases in which Indictments were dismissed for failure to allege the deprivation of a legally recognized traditional property interest as an element of the mail and wire fraud statutes. *See, e.g., Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Employees, Rest. Employees Union, AFL–CIO,* 215 F.3d 923, 926 (9th Cir.2000) (dismissing mail and wire fraud charges based on damage to goodwill); *United States v. Walters,* 997 F.2d 1219, 1224–27 (7th Cir.1993) (dismissing mail fraud charge based on university's loss of scholarship money); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 406 (9th Cir.1991) (dismissing mail fraud charge based on loss of market share); *Zauber,* 857 F.2d at 147 (dismissing mail and wire fraud charges based on loss of control over spending of pension funds); *Roitman v. New York City Transit Auth.,* 704 F.Supp. 346, 348–49 (E.D.N.Y.1989) (dismissing mail fraud claims based on damage to reputation, good name, honor and integrity).

■■■■ There is yet another reason why the Indictments in these cases must be dismissed. As the Third Circuit has recently observed: "The rule of lenity, which requires that ambiguities in criminal statutes be resolved against the government, 'serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not the courts, define criminal liability.'" *Panarella,* 277 F.3d at 697–98 (quoting *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990)). Moreover,

"[t]here are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *McNally,* 483 U.S. at 360, 107 S.Ct. 2875 (citation omitted). Thus, because ETS's alleged interest in "maintaining the integrity of the testing process" is not a traditionally recognized property right covered by the mail fraud statute, and the Indictments in these cases violate the "rule of lenity," I shall grant the Defendants' motions to Dismiss the Indictments.

In passing, I note that I do not condone the fraudulent test taking scheme alleged in the Indictments. Absent clear guidance from Congress, however, I cannot conclude that either Alkaabi or Alsugair violated the federal mail fraud statute by cheating on the TOEFL examination. As the Supreme Court has explained: "In deciding what is property under § 1341 ... 'it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *Cleveland,* 531 U.S. at 25, 121 S.Ct. 365. This approach is also consistent with the principles of federalism, articulated by the Supreme Court in *Cleveland:* "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes." *Id.* (quoting *Jones v. United States,* 529 U.S. 848, 858, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000)). Indeed, if Congress wishes to make "cheating on tests" a federal crime, it must do so with greater clarity.

---

*Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). However, the Government did not allege ETS's goodwill as the basis for the mail fraud Indictments against Alkaabi and Alsugair. *Accord United States v. Baldinger,* 838 F.2d 176, 179 (6th Cir.1988) (dismissing mail fraud Indictment that failed

to allege deprivation of goodwill). Even if the Government had alleged this theory, "the fact that the common law recognizes some rights to control alienation as property does not mean that all such rights are property rights within the meaning of the federal fraud statutes." *United States v. Evans,* 844 F.2d 36, 41 (2d Cir.1988).

### III. ROYAL EMBASSY OF SAUDI ARABIA'S MOTION TO PARTICIPATE AS *AMICUS CURIAE*

■ The Royal Embassy of Saudi Arabia ("Royal Embassy") seeks leave to appear as *amicus curiae* in these cases.[15] The term *"amicus curiae"* is old Latin that means a "friend of the court." 20A James Wm. Moore, *Moore's Federal Practice* § 329.11 (3d ed.2002). "The classic role of an amicus curiae is to assist in a case of general public interest, to supplement the efforts of counsel, and to draw the court's attention to law that might otherwise escape consideration." *Id.; see also Sciotto v. Marple Newtown Sch. Dist.,* 70 F.Supp.2d 553, 554 (E.D.Pa.1999).

■ "The extent, if any, to which an *amicus curiae* should be permitted to participate in a pending action is solely within the broad discretion of the district court." *Waste Mgmt. of Pa., Inc. v. City of York,* 162 F.R.D. 34, 36 (M.D.Pa.1995) (citations omitted); *see also Bryant v. N.J. Dep't of Transp.,* 987 F.Supp. 343, 346 n. 3 (D.N.J. 1998); *Yip v. Pagano,* 606 F.Supp. 1566, 1568 (D.N.J.1985), *aff'd,* 782 F.2d 1033 (3d Cir.1986). Although there is no rule governing the appearance of an *amicus curiae* in the United States District Courts [16], the Third Circuit's application of Fed. R.App. P. 29 [17], which governs the appearance of *amici* in the United States Courts of Appeals, provides guidance to this Court.

■ Amicus status is typically granted when: (1) the *amicus* has a "spe-cial interest" in the particular case; (2) the *amicus'* interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the *amicus* is not partial to a particular outcome in the case. *See Sciotto,* 70 F.Supp.2d at 554 (citations omitted). While the partiality of an *amicus* is a factor to be considered by a court in deciding whether to allow participation, there is no rule that *amici* must be totally disinterested. *See Waste Mgmt.,* 162 F.R.D. at 36 (citations omitted).

■ The Government objects to the Royal Embassy's motion to appear as *amicus curiae* in these actions because of the Royal Embassy's "patently partisan" stance. *See* Gov't Br. in Oppos. to *Amicus* at 9. The Third Circuit has noted, however, that "an amicus who makes a strong but responsible presentation in support of a party can truly serve as the court's friend." *Neonatology Assocs., P.A. v. Comm'r of Internal Revenue,* 293 F.3d 128, 131 (3d Cir.2002). Parties with pecuniary and policy interests have been regularly allowed to appear as *amici* in our courts. *See id.* at 131–32. As such, the Royal Embassy's partisan stance is not a bar to its appearance as *amicus* in the *Alkaabi* and *Alsugair* cases.

■ Given the number of TOEFL cases that have been filed in the District of New Jersey against Saudi Arabian citizens residing in the United States [18], and the heightened scrutiny faced by persons of Arab descent as a result of the events of

15. Although the Royal Embassy filed its brief and supporting papers under the *Alkaabi* caption, it requests leave to participate as *amicus* in both these matters. *See Amicus* Reply Br. at 21 n. 11.

16. "At the trial level, where issues of fact as well as law predominate, the aid of *amicus curiae* may be less appropriate than at the appellate level where such participation has become standard procedure." *Yip v. Pagano,* 606 F.Supp. 1566, 1568 (D.N.J.1985).

17. Fed. R.App. P. 29(b) (West 2002) permits a party to seek leave to appear as *amicus curiae* by motion. The motion must be accompanied by the proposed amicus brief and state: (1) the movant's interest; and (2) the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case. *Id.; see also Neonatology Assocs., P.A. v. Comm'r of Internal Revenue,* 293 F.3d 128, 131 (3d Cir.2002).

18. *See* United States Attorney's Office News Release 5/7/02, *Dozens of Foreign Students*

the past year, the Royal Embassy has a particularly strong interest in the outcome of these cases. Counsel for the Royal Embassy has submitted a thorough and well-written brief, which is of assistance to this Court.[19] Accordingly, I shall grant the Royal Embassy of Saudi Arabia's motion to participate in these actions as *amicus curiae*.[20]

## IV. REMAINING MOTIONS

There are five other motions pending in these two cases. Both Alkaabi and Alsugair have moved to suppress evidence. Additionally, Alkaabi has moved for discovery on a claim of alleged selective prosecution, and Alsugair has moved to strike surplusage from the Indictment. Finally, the Government has moved for an order to compel Alsugair to provide handwriting exemplars.

Because I have dismissed the Indictments against Alkaabi and Alsugair, I need not address the remaining motions in this case, which shall be dismissed as moot.

## V. CONCLUSION

For the reasons set forth above, I shall grant Alkaabi's and Alsugair's motions to dismiss the Indictments under Fed. R.Crim.P. 12(b) and grant the Royal Embassy of Saudi Arabia's motion to participate as *amicus curiae* in these cases.

The Court shall enter an appropriate form of Order memorializing its rulings.

## APPENDIX A (Alkaabi Indictment)

### *INDICTMENT*

The Grand Jury, in and for the District of New Jersey, sitting in Trenton, charges:

### COUNT ONE

#### (Conspiracy)
#### *ETS AND TOEFL*

1. At all times relevant to this Indictment:

A. The Educational Testing Service, Inc. ("ETS"), located in Princeton, New Jersey, was a corporation in the business of, among other things, designing and administering standardized examinations. ETS charged a fee to students who took ETS standardized exams. The results of these exams were relied upon by schools, colleges and universities in the United States in considering a student for admission to various academic programs. Consequently, ETS had a property interest in maintaining the integrity of the testing process.

B. One of the exams administered by ETS was the Test of English as a Foreign

---

*Arrested Nationwide in English Language Testing Scam*, at http://www.njusao.org/files/to0507_r.htm (last visited Sept. 20, 2002). At the time of the news release, fifty-six arrests of foreign nationals had been made as "part of a nationwide sweep of students and test-takers involved on the [TOEFL] scheme." *Id.* Arrests were made in thirteen states and the District of Columbia, and all cases were subsequently transferred to the District of New Jersey. *See id.* Approximately twenty-seven of the pending TOEFL fraud cases are against defendants who are citizens of Saudi Arabia. *See Amicus* Br. at 1.

19. I will not address the Royal Embassy's due process argument, which was not raised by counsel for either Alsugair or Alkaabi. "The named parties should always remain in control, with the amicus merely responding to the issues presented by the parties. An amicus cannot initiate, create, extend, or enlarge issues." *Waste Mgmt. of Pa., Inc. v. City of York*, 162 F.R.D. 34, 36 (M.D.Pa.1995) (citing *Wyatt By and Through Rawlins v. Hanan*, 868 F.Supp. 1356, 1358–59 (M.D.Ala.1994)).

20. I thank counsel for the Royal Embassy of Saudi Arabia for their willingness to be of assistance to this Court in these cases which are of considerable public interest, and for counsel's trenchant analysis of the legal issues presented.

Language, commonly known as the TOEFL exam. (TOEFL was a registered trademark of ETS.) The TOEFL exam was important for foreign students who wanted to study in the United States. Pursuant to federal regulations, a foreign student had to be a full-time student enrolled at a federally approved school, college, or university in order to obtain a student visa and thus to reside legally in the United States to pursue a course of study. Certain schools required foreign students to demonstrate English proficiency as a condition of admission to, or continued participation in, various academic programs and required foreign students to pass the TOEFL exam to demonstrate that proficiency.

C. TOEFL exams were given at various testing centers across the United States. When an individual student made an appointment to take the TOEFL exam, the student was provided with an appointment number. The student then had to appear at the test center, provide proof of identity, and provide the number given by ETS at the time he made the appointment. In addition, that student had to have his photograph taken in order to insure that someone else was not taking the examination for the student. Once the TOEFL exam was completed, the exam results were wired from the test center to a company in Baltimore, Maryland, which in turn transmitted the exam results by wire to ETS in Princeton, New Jersey for processing. ETS than mailed the test scores to locations designated by the applicant.

### The Fraudulent TOEFL Scheme

2. Beginning in or about 1999, Mahmoud Firas, a/k/a "Firas Mohammed Yahya," a/k/a "Firas Mahmoud Yahya," a/k/a "Yahya Firas" ("Firas"), Begad Abdel–Megeed ("Abdel–Megeed"), and others participated in a scheme to defraud ETS, and others, by having imposters take and pass numerous TOEFL exams on behalf of foreign students (the "Fraudulent TOEFL Scheme").

3. In the usual course, this Fraudulent TOEFL Scheme was executed as follows. The imposter appeared at the test site and identified himself as the student who had to take the exam. The imposter, posing as the student, then had his photo taken at the test site, sat for the TOEFL exam, and directed that the exam results be mailed to locations controlled by Firas. Once ETS processed the exam, the results were, as previously directed, mailed to a location controlled by Firas in California. There, Firas or one of his associates substituted the real student's photograph for the imposter's photograph, and the fraudulent TOEFL exam results were then sent to schools requiring the real student's exam results, in a phony ETS envelope.

### The Conspiracy

4. From at least as early as on or about September 11, 2001 through at least as late as or about September 20, 2001, at Princeton, in the District of New Jersey, and elsewhere, the defendant

OMAR ALKAABI, a/k/a OMAR AL–KAABI

and others, knowingly and willfully combined, conspired, confederated, and agreed to devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to place and cause to be placed in post offices and authorized depositories for mail matter, and to take and receive therefrom, and to knowingly cause to be delivered by mail according to the directions thereon, and at the places at which they were directed to be delivered by the persons to whom they

were addressed, mail matter and things to be sent and delivered by the United States Postal Service, contrary to Title 18, United State Code, Section 1341.

### Principal Object of the Conspiracy

5. The principal object of the conspiracy was to defraud ETS into reporting that the defendant OMAR ALKAABI, a/k/a OMAR AL–KAABI, and others had taken and passed the TOEFL exam when in fact the TOEFL exam had actually been taken and passed by an imposter. To achieve this principal object of the conspiracy, the Conspirators engaged in a number of actions, some of which are described below.

### Means and Methods of the Conspiracy

6. Sometime prior to September 11, 2001, the defendant OMAR ALKAABI, a/k/a OMAR AL–KAABI, arranged for an imposter associated with the Fraudulent TOEFL Scheme to take and pass the TOEFL exam for the defendant OMAR ALKAABI, a/k/a OMAR AL–KAABI.

7. On or about September 11, 2001, the imposter appeared at a test center in Tulsa, Oklahoma and claimed to be the defendant OMAR ALKAABI, a/k/a OMAR AL–KAABI. The imposter provided proof of identity in the name of defendant OMAR ALKAABI, a/k/a OMAR AL–KAABI, had his photograph taken, and took the TOEFL exam.

8. At the time he took the TOEFL exam, the imposter also directed that ETS mail the exam results to a specified location.

9. After the imposter took the TOEFL exam in the name of the defendant OMAR ALKAABI, a/k/a OMAR AL–KAABI, the exam results were wired from the test center to a company in Baltimore, Maryland, which in turn transmitted the exam results by wire to ETS in Princeton, New Jersey for processing.

10. Consistent with the directions given by the imposter, the TOEFL results were then mailed from ETS to BOX K, Moreno Valley, California.

### Overt Acts

11. In furtherance of the conspiracy and to effect the objects thereof, the overt acts that are set forth in paragraphs 6 through 10 above, and which are hereby realleged as if set forth at length in this paragraph, were committed, and caused to be committed, in the District of New Jersey and elsewhere.

All in violation of Title 18, United States Code, Section 371.

### COUNT TWO

#### (Mail Fraud)

1. The allegations contained in paragraphs 1 through 3 and paragraphs 5 through 11 of Count One of this Indictment are realleged as if set forth at length herein.

2. From at least as early as on or about September 11, 2001 through at least as late as on or about September 20, 2001, at Princeton, in the District of New Jersey, and elsewhere, the defendant

OMAR ALKAABI, a/k/a OMAR AL–KAABI

and others knowingly and willfully devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, which scheme and artifice is set forth in substance in Count One of this Indictment.

3. On or about September 20, 2001, for the purpose of executing and attempting to execute this scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, at

Princeton, in the District of New Jersey, and elsewhere, the defendant

OMAR ALKAABI, a/k/a OMAR AL-KAABI

placed and caused to be placed in a post office and authorized depository for mail matter, and took and received therefrom, and knowingly caused to be delivered by mail according to the directions thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, mail matter to be sent and delivered by the United States Postal Service, namely, fraudulent TOEFL exam results that were mailed from ETS in Princeton, New Jersey to "English Dept. Attn. Dr. Acre," Box K, Moreno Valley, California.

In violation of Title 18, United States Code, Sections 1341 and 2.

### ORDER

These matters having come before the Court on the motions of Defendants, Omar Alkaabi, a/k/a Omar Al-kaabi, and Tarik I. Alsugair, to Dismiss the Indictments, pursuant to Fed.R.Crim.P. 12(b), Thomas Abbenante, Esq., appearing on behalf of Defendant, Omar Alkaabi, a/k/a Omar Al-kaabi; Paul J. Fishman, Esq., and Karin McEwen, Esq., FRIEDMAN KAPLAN SEILER & ADELMAN LLP, appearing on behalf of Defendant, Tarik I. Alsugair; and Christopher J. Christie, Esq., United States Attorney, Andrew Leven, Esq., Assistant United States Attorney, and Amy S. Winkelman, Esq., Assistant United States Attorney, appearing on behalf of the United States of America; and the motion of the Royal Embassy of Saudi Arabia to participate as *amicus curiae,* Lawrence S. Lustberg, Esq., and Thomas R. Valen, Esq., GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, P.C., appearing on behalf of the Royal Embassy of Saudi Arabia; and,

The Court having considered the submissions of the parties, as well as the oral arguments of counsel, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 23rd day of September, 2002, hereby ORDERED that:

(1) Defendants' Motions to Dismiss the Indictments are GRANTED;

(2) The Royal Embassy of Saudi Arabia's motion to participate as *amicus curiae* in both cases is GRANTED;

(3) Omar Alkaabi's (a/k/a Omar Al-kaabi) Motions to Suppress Statements and for Discovery are DISMISSED as moot;

(4) Tarik I. Alsugair's Motions to Suppress Evidence and to Strike Surplusage are DISMISSED as moot; and

(5) The United States of America's motion for an Order requiring the defendant to provide the Government with handwriting exemplars in *United States v. Alsugair* is DISMISSED as moot.