RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOHN MADDUX, JR. (16-6368); CHRISTINA CARMAN (16-6370); JULIE COSCIA (16-6371); MICHAEL E. SMITH (16-6726),

*Defendants-Appellants*.

> Nos. 16-6368/6370/6371/6726

────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 0:14-cr-00020—David L. Bunning, District Judge.

Argued: May 3, 2018

Decided and Filed: February 26, 2019

Before: SUHRHEINRICH, GIBBONS, and KETHLEDGE, Circuit Judges.

────────────

## COUNSEL

**ARGUED:** Kent Wicker, DRESSMAN BENZINGER LA VELLE, Louisville, Kentucky, for Appellant in 16-6368. Nicole S. Elver, DRESSMAN BENZINGER LA VELLE, Louisville, Kentucky, for Appellant in 16-6370. Gregory A. Napolitano, LAUFMAN & NAPOLITANO, LLC, Cincinnati, Ohio, for Appellant in 16-6726. John M. Pellettieri, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kent Wicker, DRESSMAN BENZINGER LA VELLE, Louisville, Kentucky, for Appellant in 16-6368. Nicole S. Elver, DRESSMAN BENZINGER LA VELLE, Louisville, Kentucky, for Appellant in 16-6370. Gregory A. Napolitano, LAUFMAN & NAPOLITANO, LLC, Cincinnati, Ohio, for Appellant in 16-6726. John M. Pellettieri, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Laura K. Voorhees, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. Gary W. Lanker, LAW OFFICE OF GARY W. LANKER, Memphis,

Tennessee, for Appellant in 16-6371.  Steven D. Jaeger, THE JAEGER FIRM, PLLC, Erlanger, Kentucky, Candace Crouse, PINALES, STACHLER, YOUNG, BURRELL, & CROUSE CO. LPA, Cincinnati, Ohio, for Amicus Curiae in 16-6370.

_____

**OPINION**

_____

KETHLEDGE, Circuit Judge.  The defendants here took part in a decade-long scheme surreptitiously to sell tax-free cigarettes, thereby defrauding federal, state, and local governments of more than $45 million in tax revenue.  The federal government eventually uncovered the scheme and charged them with 34 counts of various crimes, including conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349, conspiracy to launder money in violation of 18 U.S.C. § 1956(h), and conspiracy against the United States in violation of 18 U.S.C. § 371. One of the defendants, John Maddux, pleaded guilty to 29 counts.  The other three—Christina Carman, Julie Coscia, and Michael Smith—all went to trial, where a jury convicted each of them on various counts.  These three now challenge their convictions on several grounds.  Maddux, Carman, and Coscia also challenge their sentences, arguing that the district court erred when calculating their recommended sentences under the Sentencing Guidelines.  We reject all these arguments and affirm.

I.

Cigarettes are heavily taxed.  Federal, state, and local governments each add their own layer of taxation, which increases the price dramatically from factory to shelf.  In some places, a pack sells for $13 even though manufacturers sell it for around $5.  Beginning in 2003, John Maddux, his wife Christina Carman, and their now-deceased business partner, Glenn Herndon, began selling cigarettes directly to consumers, bypassing governmental taxing authorities.  This plan enabled them to sell untaxed cigarettes at a steep discount.

The group took several steps to conceal their sales from the federal, state, and local governments.  Many if not most of their customers used credit cards to pay for the cigarettes; and Maddux told the company that processed those sales that he and Carman ran a business called

"DSL Ever-Ready Specialty Glass," which sold "glass for homes and auto."  In fact, their companies did business under the names of "Your Kentucky Tobacco Resource" and "ESR II." Maddux also told his employees to use email addresses with domain names that disguised the nature of the company's business, like "@asrhomedecor.com."  And Maddux arranged for a hotel employee to tip him off whenever officials from the Kentucky Department of Revenue came to town, so that he and Carman could avoid inspections.

Maddux and Carman also failed to report their sales to state authorities as required by federal law.  The Jenkins Act, 15 U.S.C. § 376(a) (2006), required cigarette sellers, like Maddux and Carman, to file a monthly report detailing (among other things) the names and addresses of any customers who had purchased untaxed cigarettes.  This report would enable state and local governments to collect the taxes owed by each customer.  If a seller failed to report his sales, the Act imposed a strict-liability misdemeanor punishable by six months' imprisonment.  *See* 15 U.S.C. § 377 (2006).  Maddux and Carman never filed these reports, and made sure their customers knew as much.  Their customers in turn stayed silent about their purchase of untaxed cigarettes; and so the taxing authorities never knew about them.  Through this plan, Maddux and Carman converted monies that should have been revenue for the taxing governments into profits for themselves.

Soon Maddux and Carman recruited two other cigarette sellers, Julie Coscia and Michael Smith.  Coscia ran "Cigarette Girl," a company she incorporated as "ASC Properties" to stay—as she put it—"under the radar."  Like Maddux and Carman, she gave a phony description of her business to the company that processed her transactions, stating that she sold mail-order gifts. Similarly, Smith ran "Payless Cigs," which he incorporated as "Payless Enterprises."  He likewise told his credit-card processing company that he sold gifts, novelties, and souvenirs. Neither Coscia nor Smith reported their sales as required by the Jenkins Act.

In 2010, Congress passed the Prevent All Cigarette Trafficking Act, which imposed further restrictions on the sale of untaxed cigarettes.  *See* Pub. L. 111-154, 124 Stat. 1087.  The Trafficking Act prohibits shipment of cigarettes through the United States Postal Service, requires packages containing cigarettes to be labeled as such, and directs "delivery sellers"—*i.e.*,

sellers who take orders directly from consumers or ship cigarettes by common carrier—to comply with the tax laws in the state or locality where the cigarettes are shipped. *See* 15 U.S.C. § 376a(a)(3). The Act also makes it a felony, punishable by three years' imprisonment, knowingly to refuse to report cigarette sales. *See* 15 U.S.C. § 377(a).

Maddux, Carman, Coscia, and Smith recognized that the Trafficking Act made their scheme more difficult to run within the United States, so they converted it to an offshore operation. Rather than ship cigarettes through Tobacco Resource, they began shipping through Maddux and Carman's other company, ESR II, which used suppliers in Ukraine, Israel, and Kyrgyzstan, among other places. The defendants relayed orders of cigarettes to these suppliers, who shipped them directly to customers. To pay the suppliers, Coscia and Smith wired money to Maddux and Herndon, who then wired money to several foreign bank accounts located in Austria, Latvia, and Cyprus. The suppliers then withdrew money from these accounts and shipped cigarettes to the customers in unmarked boxes.

No one—not the defendants, the suppliers, or the customers—ever declared the cigarettes to United States Customs and Border Protection, paid the federal excise taxes, or reported the sales to state or local governments. Yet officials from customs and the postal service often intercepted cigarettes mailed by the overseas suppliers. In response, Maddux and Herndon discussed disguising the boxes to conceal that they contained cigarettes.

Eventually, the federal government caught up to Maddux, Carman, Coscia, and Smith. In 2014, a federal grand jury indicted them on 34 counts. All told, the government alleged that they had deprived taxing authorities of over $45 million in tax revenue. Maddux pleaded guilty to 29 counts, including several fraud and money-laundering charges. *See* 18 U.S.C. §§ 1349, 1956(h), 1957, 371, 1001. Coscia, Smith, and Carman went to trial.

The jury convicted all three. Coscia and Smith were convicted on several counts of conspiracy to commit mail or wire fraud (four for Coscia and two for Smith) and several counts of conspiracy to launder money (three for Coscia and one for Smith). *See* 18 U.S.C. §§ 1349, 1956(h). Carman was convicted on two counts—conspiracy to commit mail and wire fraud and conspiracy to launder money—and acquitted on 19 others. *See* 18 U.S.C. §§ 1349, 1956(h).

On a post-trial motion, however, the district court also acquitted Carman of conspiracy to launder money.

At sentencing, the defendants objected to the district court's calculation of the tax revenue lost because of their fraud. The district court overruled those objections, finding Maddux responsible for about $48 million in lost taxes, Carman for $22.8 million, and Smith for $2.95 million. The district court sentenced Maddux to 120 months' imprisonment, Carman to 60 months, Smith to 42 months, and Coscia to 36 months—and then entered judgments accordingly. Each of the defendants then filed notices of appeal. Months later, the district court also ordered Carman to forfeit about $17.5 million. (Carman filed a separate notice of appeal from that order, which we will review in a separate opinion.)

## II.

### A.

Carman challenges the sufficiency of count one of the indictment, which alleged conspiracy to commit mail and wire fraud against state and local governments. We review the sufficiency of the indictment de novo. *See United States v. White*, 846 F.3d 170, 174 (6th Cir. 2017). An indictment is sufficient (in the sense of stating an offense, *see* Federal Criminal Rule 12(b)(3)(B)(v)) if it alleges conduct satisfying every element of the charged offense. *United States v. Olive*, 804 F.3d 747, 753 (6th Cir. 2015).

The elements of a conspiracy offense are the existence of "an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Faulkenberry*, 614 F.3d 573, 584 (6th Cir. 2010) (citation and internal quotation marks omitted). Here, count one alleges that, from 2008 to 2010, Carman and others agreed to a scheme by which they sold untaxed cigarettes while failing to report those sales to state governments as required by the Jenkins Act, among other acts of concealment. Carman argues that count one does not allege a conspiracy to commit mail or wire fraud because, she says, the conduct that the alleged conspirators agreed to commit, as described in that count, does not amount to mail or wire fraud.

Those frauds each comprise three elements: first, "that the defendant devised or willfully participated in a scheme to defraud"; second, that "he used or caused to be used" an "interstate wire communication" or the United States mail in furtherance of the scheme; and third, "that he intended to deprive a victim of money or property." *Faulkenberry*, 614 F.3d at 580-81 (citation and internal quotation marks omitted). Carman's argument (which Smith "adopts" by reference) goes to the first element, namely whether she participated in a scheme to defraud. "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Id*. at 581 (citation, internal quotation marks, and ellipses omitted). The false or fraudulent representation must be material. *Neder v. United States*, 527 U.S. 1, 25 (1999). Count one does not describe a scheme to defraud, Carman says, because the government did not allege that she "or her co-defendants said anything false, to any person or government, at any time." Carman Br. at 14.

But one hardly needs to make a false statement to commit fraud. "'False' and 'fraudulent' representations do not cover the same thing. Fraud has long been understood to include a broader range of deceptive conduct." *United States v. Kurlemann*, 736 F.3d 439, 446 (6th Cir. 2013). Specifically, for purposes of the fraud statutes, fraudulent pretenses or representations can include "concealment"—where one says nothing "but has a duty to speak[.]" *Id*. at 445; *accord United States v. Perry*, 757 F.3d 166, 176 (4th Cir. 2014); *cf.* Restatement (Second) of Torts § 550 cmt. b (citing *Stewart v. Wyo. Cattle-Ranche Co.*, 128 U.S. 383 (1888)).

The Supreme Court applied this principle in *Pasquantino v. United States*, 544 U.S. 349, 357 (2005). There, the defendants "concealed imported liquor from Canadian officials and failed to declare those goods on customs forms." *Id.* "By this conduct," the Court said, "they represented to Canadian customs officials that their drivers had no goods to declare." *Id.* "This, then, was a scheme designed to defraud by representations, and therefore a 'scheme or artifice to defraud[.]'" *Id.* (internal citation and some quotation marks omitted).

The same reasoning applies here. Carman and her co-defendants had a duty under the Jenkins Act to file reports for all of their untaxed-cigarette sales. By omitting to file those reports, the defendants represented to the states that they had not sold any untaxed cigarettes.

Those omissions were "material," because they naturally caused the states not to collect taxes on those sales. *See Neder*, 527 U.S. at 16. And the indictment alleges other acts of concealment—including that the defendants concealed the true nature of their businesses from credit-card processors—that confirmed that the defendants' failure to file reports was not merely inadvertent, but fraudulent. Hence count one alleged a scheme involving fraudulent pretenses or representations. *Faulkenberry*, 614 F.3d at 581.

Carman also argues that the scheme was not fraudulent for a different reason, namely that (in her view) it did not deprive the states "of money or property." *Id.* Instead, she says, it deprived states only of the information that would have been in the reports. But *Pasquantino* sinks this argument too. There, the Canadian government's entitlement to excise taxes on the smuggled liquor was no different, for purposes of the federal fraud statutes, from the states' entitlement to taxes on the cigarette sales in this case. In both cases the entitlement was a "right to be paid money," which "has long been thought to be a species of property." 544 U.S. at 356. And in both cases the defendants' concealment "deprived [the taxing government] of that money[.]" *Id.* That fact distinguishes this case from *Cleveland v. United States*, 531 U.S. 12 (2000), which Carman relies upon here. For in *Cleveland* "[t]here was no suggestion . . . that the defendant aimed at depriving the State of any money[.]" *Pasquantino*, 544 U.S. at 357. Thus, as in *Pasquantino*, Carman and her co-defendants participated in a scheme by which they "intend[ed] to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Faulkenberry*, 614 F.3d at 581 (internal quotation marks and ellipses omitted).

Yet Carman argues that a footnote in another Supreme Court decision—*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010)—shows that the scheme here was not fraudulent. There, the City of New York brought a civil claim under the RICO statute (18 U.S.C. § 1964(c)) against Hemi Group, a cigarette seller in New Mexico, for the company's failure to file reports under the Jenkins Act for cigarettes shipped into the city. 559 U.S. at 4-5. To recover on a RICO claim, a plaintiff must make two showings: first, that the defendant committed one of the statute's "so-called predicate acts," which include mail or wire fraud; and second, that the predicate act was the "proximate cause" of the plaintiff's injury. *Id.* at 6-9. The Supreme Court

assumed for purposes of argument "that failing to file Jenkins Act material" can amount to mail or wire fraud. *Id.* at 7. The Court then rejected the City's RICO claim on the ground that Hemi's failure to file the reports (with the State of New York, rather than with the City itself) was not the proximate cause of the City's failure to collect taxes on Hemi's sales of cigarettes to City residents. *Id.* at 11-12. But that holding is inapposite here, because—unlike the RICO statute—the mail and wire fraud statutes do not require any proof that the defendant's fraud caused losses for the victim. *See Pasquantino*, 544 U.S. at 371 ("[T]he wire fraud statute punishes the scheme, not its success" (internal citation and quotation marks omitted)).

In a footnote in *Hemi*, however, the Court stated in dictum that, "[e]ven if we were willing to look to Hemi's intent" for purposes of determining causation, "the City would fare no better. Hemi's aim was not to defraud the City (or the State, for that matter) of tax revenue, but to sell more cigarettes. Hemi itself neither owed taxes nor was obliged to collect and remit them. This all suggests that Hemi's alleged fraud was directed at its competitors, not the City." 559 U.S. at 13 n.1. Per this dictum, Carman asserts, the indictment here did not allege a scheme to defraud.

But Carman elides several differences between that case and this one. The first, as shown above, is that the Court's holding in *Pasquantino* (as opposed to its dictum in *Hemi*) makes clear that the indictment here did allege a scheme to defraud. Specifically, the defendants, by their omissions and acts of concealment, intended to deprive the states of their entitlement to tax revenue. And on this record any damage to the defendants' "competitors" was merely collateral. Second, "the only fraudulent *conduct* alleged" in Hemi was "a violation of the Jenkins Act." *Id.* at 14. Here, in contrast, the indictment alleged that the defendants engaged in extensive conduct to conceal both the nature of their businesses (which Hemi notably did not do) and the very fact of the defendants' cigarette sales.

Nor does it matter—for purposes of the existence of a fraudulent scheme, as opposed to RICO causation—that the defendants themselves did not owe the uncollected taxes. Fraudsters routinely divert to themselves monies that a third party owes to the victim. *See, e.g.*, *United States v. Cunningham*, 679 F.3d 355, 370-73 (6th Cir. 2012) (lawyers diverted the opposing

party's settlement payment to the lawyers' personal accounts).   That is exactly what the defendants did here, since their scheme allowed the defendants and their customers to divide between them monies (the unpaid taxes) that should have been paid to the states.

Carman's remaining argument as to the indictment's sufficiency is more policy-based than legal: namely, that we should not allow the government to "'bootstrap' a Jenkins Act violation into a mail or wire fraud offense[.]"  Carman Br. at 14.  As an initial matter, "[t]he Federal Criminal Code is replete with provisions that criminalize overlapping conduct." *Pasquantino*, 544 U.S. at 358 n.4.  And here the indictment alleged more than a Jenkins Act violation.  Instead, as discussed above, the indictment alleged a range of conduct supporting an inference that the defendants' Jenkins Act violations were just one part of a larger fraudulent scheme.  Moreover, nobody disputes that—unlike a mere failure to file reports under the Act— the scheme here involved use of interstate wire communications and the United States mails.  Whatever one might think of the proliferation of criminal laws in this country, it was Congress's prerogative to punish this combination of conduct more severely than a violation of the Jenkins Act standing alone.  The indictment sufficiently alleged a scheme to defraud.

B.

Smith challenges the sufficiency of the government's evidence for certain counts on which he was found guilty.  We view the evidence in the light most favorable to the government and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

1.

Smith argues that his convictions for conspiracy to commit fraud (counts five and six of the indictment) are invalid because, he says, the government failed to prove that he intended to defraud anyone.  Instead, he contends, the evidence showed only that he was a cigarette seller who sometimes used third-party suppliers to ship cigarettes to his customers.  But the government proved more than that about Smith's operation.  For starters, Smith failed to report (as required by the Jenkins Act) the sale of 157,000 cartons of untaxed cigarettes—which itself shows that these violations were not merely an oversight.  So does an email in which Maddux

warned Smith that the federal government had recently started "pursuing the Jenkins Act very seriously." Moreover, a jury may infer fraudulent intent from a defendant's "efforts to conceal the unlawful activity[.]" *See United States v. Smith*, 749 F.3d 465, 478 (6th Cir. 2014) (citation omitted). And like his co-defendants, Smith concealed the nature of his business from a credit-card processing company, describing the business as selling "gifts and novelties." Smith also knowingly used overseas suppliers who shipped cigarettes in unmarked boxes "to disguise the contents" from federal customs agents. Ample evidence supported Smith's convictions for conspiracy to commit fraud.

2.

Smith (albeit barely) and Coscia argue that insufficient evidence supports their convictions for conspiracy to commit promotional money laundering in violation of 18 U.S.C. § 1956(h). Under that provision, the government must prove that the defendant "knowingly and voluntarily" agreed with another person to violate the substantive provisions of the money-laundering statute. *United States v. Prince*, 618 F.3d 551, 554 (6th Cir. 2010). (Unlike other conspiracy offenses, conspiracy in violation of § 1956(h) does not require proof of an overt act. *See id.*)

Here, the relevant "substantive provision" is 18 U.S.C. § 1956(a)(2)(A), which provides in relevant part:

> Whoever . . . transfers . . . funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> > (A) with the intent to promote the carrying on of specified unlawful activity; . . .
>
> shall be [subject to criminal liability].

Thus, to violate this section, a defendant must move money into or out of the United States with the specific intent to promote some "specified unlawful activity[.]" *See United States v. Trejo*, 610 F.3d 308, 314-15 (5th Cir. 2010). The statute defines "specified unlawful activity" to include mail and wire fraud. *See* 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(B). For Smith and Coscia to have been guilty of conspiracy to commit promotional money laundering, therefore,

each of them must have knowingly and voluntarily agreed to move money between the United States and another country with the specific intent to promote a scheme to defraud.

Smith's argument as to these convictions is the same as his argument with respect to his convictions for conspiracy to commit fraud: that he lacked knowledge that anything he was doing was illegal. We reject this argument for the same reasons we rejected the other one.

Coscia, for her part, concedes that the proofs showed "some sort of agreement" between the defendants and that she "knew *something* illegal was involved" with respect to her cigarette sales. Coscia Br. at 17-18. The evidence certainly showed that much: Coscia herself told federal agents that, "if the IRS discovered what she was doing, th[en] she would go to prison for a long time," and that she named her business "ASC Properties" to "stay under the radar." And when federal agents executed a warrant to search her home, an agent overheard Coscia say, "I knew this was going to happen, I'm not surprised they came." What the evidence did not show, in Coscia's view, was that she agreed to move money internationally with the specific intent to promote a scheme to defraud the states or federal government of tax revenues.

But plenty of evidence showed that Coscia did agree to do those things—and indeed that she did them. Coscia's own emails showed that she made agreements with suppliers in Israel, Ukraine, and Kyrgyzstan to buy cigarettes; that she relayed customer orders to those suppliers, and transferred thousands of dollars to international accounts to pay them; and that she tracked exactly where and to whom that money was sent. The evidence also showed that Coscia used phony credit-card and check-processing accounts to conceal that the product she was selling was cigarettes. Given that the federal and state governments were entitled to tax revenues from those sales, that concealment in particular supported an inference that Coscia intended to defraud them. And Coscia did not report sales of untaxed cigarettes as required by federal law. Taken together, this evidence was enough for the jury to find that Coscia knowingly and voluntarily agreed to transfer money internationally in furtherance of a scheme to defraud the federal and state governments of tax revenues.

C.

Carman, Coscia, and Smith challenge the district court's jury instructions.

1.

Smith argues that the trial court should have specifically instructed the jury that he was not charged with a violation of either the Jenkins Act or the Trafficking Act. We review the district court's denial of a proposed jury instruction for an abuse of discretion. *See United States v. Volkman*, 797 F.3d 377, 385 (6th Cir. 2015). A district court's refusal to give a proposed jury instruction is an abuse of discretion only if the proposed instruction (i) correctly states the law, (ii) is "not substantially covered" by the instructions actually given, and (iii) concerns a point so important "that failure to give it substantially impairs the defendant's defense." *Id.*

Here, Smith's proposed instruction would have rehashed issues already covered by the court's instructions. Those instructions already stated that the jury had a "duty to separately consider the evidence against each defendant on each charge"; that "the defendants have been charged with different crimes"; and that the defendants were "only on trial for the particular crimes charged in the indictment." And the indictment did not charge Smith with violating either the Jenkins Act or the Trafficking Act. Hence the district court did not abuse its discretion when it chose not to add Smith's proposed instruction.

2.

The next instructional argument is more serious. By way of background, the question whether a defendant's misrepresentations or concealment were "material" is a factual one for the jury. *Neder*, 527 U.S. at 24-25. Carman (joined by Coscia and Smith) argue that the district court converted that question into a legal one when it instructed the jury as to materiality. The relevant question provided as follows:

> A misrepresentation or concealment is "material" if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension. A material omission, such as a failure to file required reports, may constitute a misrepresentation or concealment under the Mail and Wire Fraud statutes.

By all accounts the first sentence of this instruction was fine. The problem lies with the second sentence, which in Carman's view told the jury not merely that a reporting violation under the Jenkins Act *can* be a "material omission," but that it *always* is. The point is grammatical: the phrase "such as a failure to file required reports" is nonrestrictive, which means that it provides an example of what constitutes a material omission. *See, e.g.*, Strunk & White, *The Elements of Style* 4-5 (4th ed. 2000). And by offering "a failure to file required reports" as an example of a material omission, the sentence tells the reader that such a failure is always material. Consider a simpler sentence with the same structure: "Hardwood trees, such as oak and ash, are good for firewood." The reader understands not only that oak and ash are good for firewood, but also that they are hardwood trees. The same is true here: the reader understands not only that "a failure to file required reports . . . may constitute a misrepresentation or concealment[,]" but also that such a failure is "a material omission."

The instruction's use of the word "may" does not change that understanding. That word modifies only whether the omissions amounted to "a misrepresentation or concealment[,]" not whether they were "material[.]" (By way of contrast, the instruction would have been fine if it had said, "A failure to file required reports may be a material omission.") The instruction thus put a thumb on the scale in favor of finding that the Jenkins Act omissions were material, which (per the district court's other instructions) the jury necessarily found when it convicted the defendants of conspiracy to commit mail and wire fraud.

The problem with Carman's argument, however, is that she did not present it to the district court. "A party who objects to any portion of [the district court's] instructions . . . must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). "The obvious purpose of this requirement is to inform the trial judge of possible errors, affording an opportunity for correction." *United States v. Robinson*, 602 F.2d 760, 762 (6th Cir. 1979). Carman did inform the court of her "specific objection," which was that the instruction suggested to the jury that any failure to file a required report is a material omission. But she did not inform the court of the "*grounds* for the objection[,]" which are the grammatical grounds described above. And had she done so, the district court easily could have fixed the instruction on the spot. Thus, per the Rule's express

terms, we can review the instruction only for plain error.  *See* Fed. R. Crim. P. 30(d) ("Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).").

To show plain error under Rule 52(b), Carman must show among other things that the error "affect[ed] [her] substantial rights."  Fed. R. Crim. P. 52(b).  She has not made that showing.  At trial, the government presented testimony from one federal tax official and five state officials to the effect that they rely upon Jenkins Act reports to collect taxes from sales of untaxed cigarettes.  The defendants presented no evidence to the contrary.  The challenged instruction therefore did not "produce a grave miscarriage of justice."  *See, e.g.*, *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010).  Carman is not entitled to relief on this ground.

## D.

Smith argues that the district court erred under Rule 8 of the Federal Rules of Criminal Procedure when it tried him together with Carman and Coscia.  But Smith likewise failed to present this argument to the district court, so we review the court's decision only for plain error.  *See United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015).

Rule 8(b) permits joinder of defendants alleged to have participated in "the same series of acts or transactions," meaning acts or transactions that are "part of a common scheme or plan."  *United States v. Beverly*, 369 F.3d 516, 533 (6th Cir. 2004).  We apply that standard by looking to the allegations in the indictment.  *See* Fed. R. Crim. P. 8(b); *United States v. Rittweger*, 524 F.3d 171, 178 (2d Cir. 2008); *cf. United States v. Deitz*, 577 F.3d 672, 691 (6th Cir. 2009).

Here, the indictment alleged that each of the defendants—Smith included—shipped cigarettes to their customers through Tobacco Resource, used many of the same overseas suppliers, and pooled their money into the same bank accounts to pay those suppliers.  The indictment thus alleged that Smith and the other defendants participated in a common scheme or plan, which means that the district court properly joined them for trial.

Smith also argues that the district court erred when it denied his motion for severance under Criminal Rule 14.  But the argument that Smith makes now in support of severance is

different from the argument he made in the district court, so again we review the district court's decision only for plain error. *See United States v. Doxey*, 833 F.3d 692, 702 (6th Cir. 2016).

Rule 14 permits a district court to sever a defendant from a joint trial if "consolidation for trial appears to prejudice a defendant[.]" Fed. R. Crim. P. 14(a). Smith's argument now is that he was a bit player in the conspiracy, and that the evidence pertaining to the other defendants "dominated the proceedings" and "spill[ed] over" to him. Smith Br. at 17. But a "spillover of evidence from one case to another generally does not require severance, unless [the] defendant can point to specific substantial, undue, or compelling prejudice." *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014) (internal quotations omitted). Smith points to none here—instead his argument is conclusory—and thus he is not entitled to relief.

III.

Apart from their convictions, Maddux, Carman, and Coscia also appeal the district court's calculation of "actual loss" under the Sentencing Guidelines. The district court deemed the "actual loss" caused by each defendant's fraud to be all the unpaid taxes from the sales concealed by each defendant—totaling $48 million for Maddux, about $23 million for Carman, and about $700,000 for Coscia. We review de novo the district court's method for calculating the actual loss, and review its factual findings for clear error. *United States v. Warshak*, 631 F.3d 266, 328 (6th Cir. 2010).

The Guidelines instruct a district court to determine the "loss" caused by a defendant's fraudulent conduct. *See* U.S.S.G. § 2B1.1 cmt. n.3. Loss can be either the "actual loss" or the "intended loss," whichever is greater. *Id.* "Intended loss" is "the pecuniary harm that the defendant purposely sought to inflict[.]" *Id.* § 2B1.1 cmt. n.3(A)(ii). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(i). And harm is reasonably foreseeable if "the defendant knew, or under the circumstances, reasonably should have known, [that it] was a potential result of the offense." *Id.* § 2B1.1 cmt. n.3(A)(iv). The Commission chose "not to use the term 'consequential damages,' or any similar civil law distinction between direct and indirect harms," because "the reasonable

foreseeability standard provides sufficient guidance to courts[.]"  U.S.S.G. Manual app. C, vol. II, at 178 (2003).

Here, the defendants obviously knew that the concealment of their cigarette sales could result in unpaid taxes on those sales.  Indeed their business model depended on it.  The defendants' principal argument, rather, is that their fraud was not the "proximate cause" of the governments' entire loss of unpaid taxes.  *See, e.g.*, Carman Br. at 32.  In support, the defendants again rely on *Hemi*, which held that RICO's proximate-cause element required "some direct relation between the injury asserted and the injurious conduct alleged."  559 U.S. at 9 (citation omitted).

But the *Hemi* standard of causation is plainly different from the Guidelines standard. *Hemi* demanded a "direct relation" between conduct and crime; the Sentencing Commission, in contrast, expressly rejected the use "civil law distinction[s] between direct and indirect harms," and adopted instead a standard of "reasonable foreseeability."  And the defendants do not argue, much less show, that the losses found by the district court were not reasonably foreseeable.

The defendants also argue that they did not cause the loss of the unpaid taxes because the defendants themselves did not owe them.  (Their customers did.)  But this argument is just a restatement of their *Hemi* direct-causation one.  It therefore fails for the same reasons.

The defendants next contend that the actual loss from their conduct is zero, because the state and local governments could still collect the unpaid taxes today.  But we calculate actual loss "at the time the crime was detected[.]"  *See United States v. Flowers*, 55 F.3d 218, 221 (6th Cir. 1995).  Hence this argument too is meritless.  Finally, the defendants argue that the victims' losses can be attributed only to the defendants' corporations, since the Jenkins Act requires corporations, not individuals, to report cigarette sales.  But the defendants were not convicted of failing to file Jenkins Act reports.  Instead they were convicted of fraud.  Thus fraud, not a failure to file reports, was "the offense" that drove the "actual loss" calculation.  *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(i).  The defendants therefore have not identified any basis on which to set aside the district court's determinations of actual loss.

\*          \*          \*

The convictions of Maddux, Coscia, Carman, and Smith are affirmed. Their respective terms of imprisonment are affirmed. The district court's January 17, 2017 forfeiture order will be the subject of a separate opinion.