NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0130n.06

No. 20-3267

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Mar 12, 2021 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ANTHONY L. INGRAM, | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: WHITE, LARSEN, and NALBANDIAN, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge**. Defendant Anthony Ingram appeals his kidnapping conviction, arguing that the district court erred in admitting other-acts evidence under Federal Rule of Evidence 404(b), the jury instructions were erroneous, and the evidence was insufficient to support his conviction. We **AFFIRM**.

**I.**

A grand jury indictment charged Ingram with kidnapping in violation of 18 U.S.C. § 1201(a)(1).[1] The indictment alleged that Ingram kidnapped the victim, H.K., for the purpose of sexually assaulting her. Before trial, the government filed a motion in limine and a notice of intent to use Rule 404(b) evidence, seeking to introduce evidence that Ingram's phone was used to conduct numerous internet searches related to pornography involving rape, kidnapping, or forcible sexual conduct. The government argued that the evidence is admissible to show Ingram's intent

---

[1] Ingram was also charged with obstruction of justice, but that count was dismissed and is not at issue in this appeal.

and his state of mind, or that it constituted background, or res gestae, evidence. At the final pretrial hearing, the government clarified that it did not intend to introduce any pornographic images or videos from the websites Ingram visited, but sought only to admit the search terms Ingram used and the titles and URLs of the websites he visited. The district court rejected the government's res gestae argument but explained that it would likely admit the evidence as relevant to establishing Ingram's specific intent, so long as some of the more prejudicial and irrelevant terms, such as "teen," were redacted. The district court directed the parties to review the search terms and stated that it would revisit the issue later. Before trial, the district court ordered the government to redact other terms, including "roofies" and "chloroform." With those redactions, the evidence, consisting of a list of 118 internet searches and up to 160 website visits over the five weeks preceding the alleged rape, was admitted at trial over Ingram's objection.

The following additional evidence was presented at trial. The victim, H.K., testified that she met Austin Redmon—a long-haul truck driver who worked for the same company as Ingram—on an online dating website. Redmon sent H.K. $200, and H.K. used that money to travel by car from Colorado to a truck stop in Indiana, where Redmon picked her up in his truck. Redmon and H.K. spent several days together in Redmon's truck delivering and picking up various loads, traveling to Michigan, Georgia, Maryland, and then back to Michigan. Redmon and H.K. had a consensual sexual relationship during the trip. While in Georgia, however, Redmon and H.K. had an altercation because Redmon had been drinking and wanted to engage in sexual acts with which H.K. was not comfortable. Around that time, H.K. decided she wanted to go home. Redmon told H.K. that he could not take her to her car in Indiana, but Ingram would meet them with his truck in Michigan and drive her to her car in Indiana, which Redmon told H.K. was on Ingram's route.

2

GPS records and Ingram's internet search history show that while Ingram was en route to Michigan to pick up H.K., his phone was used to search whether it is "against the law to abandon someone in the middle of the road trip," and whether "[i]f someone is riding with you if you leave them at a gas station against their will and drive off is that against the law." Ex. 308; Ex. 309.

H.K. testified that when Ingram arrived at the designated truck stop in Michigan, around 6:50 pm on August 10, 2018, Redmon exited his truck and went to Ingram's truck to talk to Ingram without H.K. A few minutes later, Redmon called H.K. on her cell phone and told her to bring her belongings to Ingram's truck. H.K. did not know Ingram and did not speak to him until she entered his truck.

Before entering Ingram's truck, H.K. discovered that Redmon had deleted his contact information from her phone, and she later realized that he had also blocked her on social-media sites. Soon after Ingram and H.K. departed the truck stop in Michigan, H.K. realized that Ingram was not driving in the direction of her car in Indiana. When she asked him why, Ingram explained that he needed to go to Maryland first and would take H.K. back to her car within a week. Although H.K. told Ingram that she needed to get back to her car right away, Ingram declined, saying "Sorry." R. 54, PID 611. H.K. called her sister and a friend and spoke to them about finding another way home, to no avail. H.K. was scared and planned to get out of the truck at the next stop.

Around 10:00 pm, near Hudson, Ohio, Ingram pulled the truck over on the side of the interstate and got out to urinate. When he reentered the truck, Ingram told H.K. that he had "bought" her from Redmon for $500, "so we are going to do what I say." *Id.* at PID 616. After a struggle, Ingram took H.K.'s phone and raped her, slapping her on the left cheek and threatening her with what appeared to be a gun.

About an hour later, Ingram pulled his truck into a Pilot truck stop in Austintown, Ohio. H.K. testified that Ingram had told her to stay near him, but H.K. got out of the truck while Ingram was pumping gas, gave him a hug, and went into the Pilot without any of her belongings. After using the Pilot restroom, H.K. asked a female employee at the McDonald's connected to the Pilot if she could use a phone to call 911. The McDonald's employees hid H.K. behind the counter, where she would be out of sight if Ingram came in looking for her. H.K. told the 911 dispatcher that she had been "sold in sex trafficking" and asked for help. *Id.* at PID 638.

The police arrived minutes later. H.K. then went through multiple interviews with officers, consented to a sexual-assault evaluation, and stayed in a nearby safe house. Ingram's sperm DNA was found on H.K.'s inner thigh, vaginal swab, and underwear, and Ingram's non-sperm DNA was found on H.K.'s left cheek, consistent with H.K.'s account of an open-handed slap. There was no evidence of acute trauma in H.K.'s genitals; however, the nurse who examined H.K. testified that an oft-cited study found that approximately ninety-five percent of sexual-assault victims do not have genitalia injury.

Surveillance video showed Ingram walking into the Pilot around the time the police arrived, staying inside for two-and-a-half minutes, and then exiting the Pilot and driving away. Phone records showed that Redmon and Ingram called each other several times that night and the next morning, and GPS records showed that Ingram made a brief stop on the side of the road shortly before midnight. Several months later, law enforcement found H.K.'s phone and other personal belongings where the GPS records indicated Ingram had stopped.

Ingram was arrested the morning after the Pilot stop. Officers located a BB gun that looked like a real firearm in an outside compartment of Ingram's truck. Officers also tracked Redmon's truck to a parking lot in Columbus, Ohio, where they found the truck abandoned.

4

The government introduced audio of Ingram's August 11 interview with officers. The government highlighted several of Ingram's statements that were inconsistent with other evidence introduced at trial, including Ingram's statements that H.K. likely still had her cell phone with her; that he waited almost forty minutes for H.K. to come out of the Pilot before he left; and that he had placed H.K.'s belongings near one of the fuel pumps. Ingram also did not initially volunteer that he and H.K. engaged in sexual activity, but later said it was consensual.

The jury found Ingram guilty of kidnapping, and the district court imposed a bottom-of-the-Guidelines sentence of 360 months' imprisonment.

## II.

Ingram raises three challenges to his conviction: (1) that the district court improperly admitted evidence that he had searched for and visited websites with pornography involving rape, kidnapping, or forcible sexual conduct; (2) that the jury instructions were erroneous; and (3) that the evidence was insufficient. We address each challenge in turn.

## A.

We review most evidentiary challenges for abuse of discretion, but we have been inconsistent in our review of rulings made under Federal Rule of Evidence 404(b). *United States v. LaVictor*, 848 F.3d 428, 444 (6th Cir. 2017).

> Sometimes, this Court will: (1) review for clear error the district court's determination that prior bad acts took place; (2) apply *de novo* review to a district court's determination that the evidence was offered for a permissible purpose; (3) and review for abuse of discretion the determination that the probative value of 404(b) evidence is not substantially outweighed by unfair prejudice. Other times, this Court has applied a single-tier abuse of discretion standard.

*Id.* at 444-45 (citations omitted). We need not wade into this debate, as Ingram's challenge fails under either standard of review. We will therefore apply the three-tiered standard as it is arguably more favorable to Ingram.

Rule 404(b), entitled "Other Crimes, Wrongs, or Acts," provides in part that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but the "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(1)-(2).  At issue in this case is the search history and website visits made from Ingram's phone showing repeated searches for rape-related pornography in the five weeks preceding Ingram's encounter with H.K.  There is no dispute as to the first step in our analysis, i.e., Ingram does not argue that the district court clearly erred in finding that Ingram in fact used his phone to conduct these searches.[2]

Ingram argues that his internet history is irrelevant to whether he kidnapped H.K.  He relies only on our decision in *United States v. Clay*, 667 F.3d 689 (6th Cir. 2012).  In *Clay*, the defendant stole a woman's car at gunpoint and was convicted of carjacking and brandishing a firearm.  *Id.* at 691.  Over the defendant's objection, the district court admitted evidence of an incident from more than a year before where the defendant allegedly asked a teenager if she wanted a ride and, when she resisted, grabbed her and hit her in the face with a gun.  *Id.* at 692, 694.  The district court admitted the evidence as relevant to establishing the defendant's specific intent to commit carjacking.  *Id.* at 692.  A divided panel of this court held that the district court erred in concluding that the evidence was admissible for a proper purpose.  *Id.* at 696.  We explained that admitting

---

[2] After conceding there was sufficient evidence to find that the acts occurred, Ingram argues that the government cherry-picked the evidence by introducing his search history for only the five weeks preceding the alleged rape, even though he may have routinely searched for similar pornography for much longer.  However, this argument was never pursued below.  Once the Rule 404(b) ruling was made, Ingram did not seek to introduce his search history for the period preceding the five weeks.  We therefore do not consider this argument in our Rule 404(b) analysis.  *See United States v. Harris*, 9 F.3d 493, 499 (6th Cir. 1993) ("As a general rule, we will not consider issues not presented to and considered by the district court.")

the evidence "perches perilously close to proving specific intent by showing propensity, as it suggests that a person who engages in bad behavior toward another is likely to do so again." *Id.* Further, "[t]he two offenses at issue—assault and carjacking—are too unrelated and too far apart in time to be probative of whether [the defendant] had the specific intent to do harm to [the carjacking victim]; they merely show the criminal character of [the defendant]." *Id.*

*Clay* is distinguishable. The two primary reasons the court in *Clay* held that the evidence was not introduced for a proper purpose—remoteness in time and lack of similarity to the instant offense—do not aid Ingram here. First, the district court admitted searches and website visits for only the five weeks preceding the offense, which is sufficiently close in time. Second, the government's theory of the case, as charged in the indictment, was that Ingram inveigled H.K. into entering his truck for the purpose of sexually assaulting her. *See United States v. Van Metre*, 150 F.3d 339, 350-51 (4th Cir. 1998) ("One way for the government to satisfy this specific intent requirement [of kidnapping] was to prove that [the defendant]'s purpose in abducting [the victim] was, from the very start, for his own sexual gratification."); *see also* R. 24, PID 85 (Ingram agreeing that the government must prove that "[t]he kidnapping must be for the specific purpose of the sexual assault"). Ingram's defense was that the sexual contact was consensual and that H.K. fabricated the rape story to get herself out of the situation, placing his intent at issue. "[W]e have approved of the admission of other acts evidence to show specific intent in certain circumstances." *Clay*, 667 F.3d at 695 (citing *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994)).

Although not directly on point, this and other courts have recognized the permissible use of pornography when it is similar to the charged sexual offenses. *See, e.g.*, *United States v. Libbey-Tipton*, 948 F.3d 694, 702 (6th Cir. 2020) ("It is logical to infer that Libbey-Tipton's preference for pornography depicting prepubescent girls would translate from his actions in the molestation

of his four-year-old cousin and serve as relevant evidence of whether it was Libbey-Tipton that downloaded the [child pornography] images. This connection aligns with the court's reasoning in admitting prior-act evidence to show intent and knowledge in [another case]."); *United States v. Torrez*, 869 F.3d 291, 301 (4th Cir. 2017) ("The Government produced evidence of pornographic videos showing violence against women who were sleeping, unconscious, or restrained. This evidence was admitted to show intent and motive, as well as modus operandi since Snell was murdered in the early morning in her bed, and officials discovered Appellant's semen on her bed sheets."); *United States v. Long*, 328 F.3d 655, 663 (D.C. Cir. 2003) (affirming admission of evidence of the defendant's uncharged child pornography activities in the defendant's trial for child pornography and related sex offenses, finding the evidence was relevant to intent); *State v. Russo*, 336 P.3d 232, 241 (Idaho 2014) (affirming rape and kidnapping convictions and the admission of Rule 404(b) evidence because "the evidence of Defendant's fantasies and his collecting pornography that was consistent with those fantasies was relevant to his motive in this case"); *Womack v. State*, 731 S.E.2d 387, 391 (Ga. Ct. App. 2012) ("And here, the relevant pornography depicted scenes of rape and/or bondage, and Womack was indicted for committing the offense of forcible rape, which at points involved binding the victims' hands. Thus, this evidence did not merely show Womack's lustful disposition in general but instead depicted a lustful disposition toward a particular sexual activity and his bent of mind to engage in that activity." (internal quotation marks and footnote omitted)). *But see State v. Clark*, 452 S.W.3d 268, 284-93 (Tenn. 2014) (concluding that evidence showing that the defendant viewed adult pornography in a case alleging sexual abuse of a child was erroneously admitted).

Still, this is a close case. We generally find that "[e]vidence of intent is probative when the evidence relates to conduct that is substantially similar and reasonably near in time to the

8

specific intent offense at issue," *LaVictor*, 848 F.3d at 447 (internal quotation marks omitted) (quoting *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015)), and *watching* rape-related pornography, on the one hand, and *kidnapping* for the purpose of sexually assaulting, on the other, are not factually similar acts. However, caselaw recognizes the relevance of pornography that is similar to the charged sexual offenses, and the rape-related pornography Ingram was searching for or viewing was similar to the allegations against him. Some of the webpages he visited included the phrases "kidnapped and forced" or "forced at gunpoint" in their titles. R. 57, PID 1061. Further, the searches were numerous and conducted close in time to the alleged kidnapping for the purpose of rape. Under the facts of this case, we conclude that the evidence showing that Ingram had a sexual interest in rape pornography is probative of Ingram's intent in inveigling and holding H.K. Therefore, the evidence was admitted for a proper purpose.

Finally, we consider whether the district court abused its discretion in concluding that the probative value of the search history was not substantially outweighed by the danger of unfair prejudice. *LaVictor*, 848 F.3d at 444-45. "[W]e grant the district court 'very broad' discretion in making [these] determinations." *Libbey-Tipton*, 948 F.3d at 701 (quoting *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006)). "In reviewing the district court's balancing of the evidence, this Court 'look[s] at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *LaVictor*, 848 F.3d at 447 (alteration in original) (quoting *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006)). Here, although the evidence was potentially prejudicial, the district court reduced the risk of unfair prejudice by requiring certain terms to be redacted, ensuring that only relevant search terms, website titles, and URLs—rather than any images or videos—were admitted, and providing an appropriate limiting instruction. *See id.* at 448 ("Furthermore, a limiting instruction was given

9

informing the jury on the proper use of the evidence, which ameliorated the risk of unfair prejudice.").

Ingram did not request, and the district court did not provide, a limiting instruction at the time the Rule 404(b) evidence was presented. However, in the final charge to the jury, the district court included the following instruction:

> You have heard testimony and saw documents that the defendant's cell phone contained Internet searches. If you find the defendant performed those searches, you can consider the evidence only as it relates to the government's claim on the defendant's intent. You must not consider it for any other pur[po]se. Remember that the defendant is on trial here only for kidnapping, not for the other acts. Do not return a guilty verdict unless the government proves the crime charged in the indictment beyond a reasonable doubt.

R. 59, PID 1298. We presume that juries follow their instructions. *United States v. Steele*, 919 F.3d 965, 973 (6th Cir. 2019).

Because the evidence was probative of Ingram's intent and the district court took steps that limited the potential for unfair prejudice, the district court appropriately exercised its broad discretion in concluding that the probative value was not substantially outweighed by the danger of unfair prejudice.

**B.**

Ingram next challenges the district court's jury instructions. "Ordinarily, we 'review de novo a claim that a jury instruction improperly or inaccurately stated the law.'" *United States v. Hamm*, 952 F.3d 728, 741 (6th Cir. 2020) (quoting *United States v. Lawrence*, 735 F.3d 385, 427 (6th Cir. 2013)). Here, however, the government argues we should review for plain error because Ingram did not make the same objections before the district court as he does on appeal. *See United States v. Maddux*, 917 F.3d 437, 448 (6th Cir. 2019) (citing Fed. R. Crim. P. 30(d)). Because Ingram does not contest the government's argument and it does not appear that he preserved his challenges, we review for plain error. *Id.* "Under that standard, this court may reverse for

10

'(1) error, (2) that is plain, and (3) that affect[s] substantial rights' if '(4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Buchanan*, 933 F.3d 501, 508 (6th Cir. 2019) (alterations in original) (quoting *United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019)).

Ingram first argues that by instructing the jury that in order to convict, it must find that "Ingram held H.K. for some purpose of his own or benefit to him, for example, for the purpose of forcing H.K. to have sex with him," R. 59, PID 1294, the district court "allowed the jury to understand that less was required for conviction than what was actually charged in the Indictment," Appellant's Br. at 43. He notes that the indictment charged that Ingram held H.K. "for the purpose of committing a sexual assault against H.K.," R. 1, PID 1, and thus argues that the quoted instruction "had the effect of watering down the government's duty to prove its case," Appellant's Br. at 42. We see no plain error in the district court's instruction, as it accurately stated the law. The statute requires that the defendant hold the victim "for ransom or reward or otherwise," 18 U.S.C. § 1201(a), and courts have broadly construed the "or otherwise" language to mean "in order that the captor might secure some benefit to himself," *Gooch v. United States*, 297 U.S. 124, 128 (1936), or "for some purpose of his own," *United States v. Small*, 988 F.3d 241, 250 (6th Cir. 2021) (internal quotation mark omitted) (quoting *United States v. Sensmeier*, 2 F. App'x 473, 476 (6th Cir. 2001)), language that tracks the district court's instruction. The district court's additional language—"for example, for the purpose of forcing H.K. to have sex with him"—sought to tailor the instructions to the specific facts of this case, the conduct charged in the indictment, and the only purpose suggested by the government at trial. We see no clear or obvious error in this language.[3]

---

[3] Ingram does not specifically argue that a constructive amendment or a prejudicial variance occurred. Even if we were to construe his jury-instruction argument as an argument that a constructive amendment or variance

To the extent Ingram challenges whether holding H.K. "for the purpose of forcing H.K. to have sex with him" qualifies as "for ransom or reward *or otherwise*" under 18 U.S.C. § 1201(a)— and it is unclear whether he does—this challenge fails as well. Courts routinely construe the "or otherwise" language broadly, and holding the victim for the purpose of forcing her to have sex satisfies that element. *See, e.g.*, *United States v. Brown*, 330 F.3d 1073, 1076, 1078 (8th Cir. 2003) (upholding a kidnapping conviction where the defendant sexually assaulted the victim, reasoning that "it is well-settled that he violated § 1201(a) by kidnaping and holding Jane Doe for a non-pecuniary purpose, whether or not he also held her for ransom or reward"); *Sensmeier*, 2 F. App'x at 477 (upholding conviction based on the theory that the defendant held the victim to assault her); *United States v. Williams*, 998 F.2d 258, 262 (5th Cir. 1993) (affirming kidnapping conviction because the jury could have found the defendant intended to rape or assault the victim); *United States v. Eagle Thunder*, 893 F.2d 950, 951-53 (8th Cir. 1990) (affirming kidnapping conviction where the defendant inveigled victim into his car, lied to the police, knocked her to the ground, and was present when she was sexually assaulted).

Ingram also appears to argue that the instruction on what constitutes "holding" the victim was erroneous. He complains that the government presented too many witnesses to testify about the alleged rape and "that the government was able to supplant its allegations of non-consensual sex in a fashion which misled the jury into understanding that an alleged 'non-consensual sexual encounter' could equate to holding someone against their will." Appellant's Br. at 36. The district court's instruction on this element was not plainly erroneous. The district court instructed the jury as follows:

occurred, that argument would fail. The government's proof at trial was consistent with the theory of kidnapping as charged in the indictment, so there was no constructive amendment or prejudicial variance. *See United States v. Kuehne*, 547 F.3d 667, 685 (6th Cir. 2008).

> To "hold" means to detain, seize, or confine a person in some manner against that person's will. The holding need only be for an appreciable period of time. It is not necessary that the government prove that the holding occurred prior to the transportation in interstate commerce. However, the holding must be separate from the transportation.

R. 59, PID 1295. Although Ingram appears to take issue with the first two sentences of the instruction, that instruction is consistent with the Supreme Court's interpretation of § 1201. *See Chatwin v. United States*, 326 U.S. 455, 460 (1946) ("The act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim."); *see also United States v. Wills*, 346 F.3d 476, 493 (4th Cir. 2003) (approving a similar instruction). Because Ingram points to no contrary authority, we cannot find that the district court plainly erred in giving this instruction.

### C.

Finally, Ingram challenges the sufficiency of the evidence. A jury verdict is supported by sufficient evidence if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gooch*, 850 F.3d 285, 288 (6th Cir. 2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). After a guilty verdict, we review sufficiency challenges viewing all evidence and drawing all reasonable inferences in the government's favor. *United States v. Cecil*, 615 F. 3d 678, 691 (6th Cir. 2010). Thus, "[a] defendant challenging the sufficiency of evidence 'bears a very heavy burden.'" *United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015) (quoting *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)).

Ingram first argues that there was no evidence that he "unlawfully seize[d], confine[d], inveigle[d], decoy[ed], kidnap[ped], abduct[ed], or carrie[d] away" H.K., 18 U.S.C. § 1201(a), because H.K. testified that she never even spoke with Ingram before getting into his truck. The government's theory at trial, and the theory it presses on appeal, is that Ingram inveigled H.K.,

13

i.e., he "lure[d] or entice[d] [H.K.] through deceit or insincerity," or "persuaded [H.K.] dishonestly," INVEIGLE, Black's Law Dictionary (11th ed. 2019), by deceptively letting H.K. believe that he would take her to her vehicle in Indiana. Sufficient evidence supports this theory. H.K. testified that Redmon told her that Ingram would take her directly from Michigan to her car in Indiana. She also testified that Redmon spoke privately to Ingram immediately before she got into Ingram's truck, and phone records showed that Ingram and Redmon communicated numerous times both before and after Ingram met H.K. H.K. further testified that Ingram told her that he had bought her from Redmon for $500. Additionally, Ingram searched the internet a few hours before he met H.K. about whether it was legal to abandon someone at a gas station during a road trip. A reasonable juror could infer from this evidence that Ingram never had any intention of taking H.K. to her car in Indiana, despite assurances from both Redmon and Ingram that Ingram would.[4] Accordingly, the government presented sufficient evidence that Ingram inveigled H.K.

Next, Ingram argues that there was no evidence that Ingram held H.K. within the meaning of the statute, which requires that the defendant "hold[] [the victim] for ransom or reward or otherwise." 18 U.S.C. § 1201(a). Ingram first stresses that H.K. could not have been held because she supposedly could have run away when Ingram pulled his truck on the side of the interstate to urinate shortly before he raped her. Ingram's argument is unpersuasive. In *Chatwin*, the Supreme Court explained that "[t]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." 326 U.S. at 460. The Supreme Court reversed the kidnapping conviction in that case, reasoning that there was "no proof that [the defendant] or

---

[4] H.K. testified that when she realized they were heading away from Indiana, she asked Ingram why. He replied that he thought Redmon had told her that Ingram was taking her to Maryland first, and said that he would have her back at her car in Indiana within a week.

any of the other petitioners willfully intended through force, fear or deception to confine the girl against her desires" because there was no evidence that the alleged victim "was deprived of her liberty, compelled to remain where she did not wish to remain, or compelled to go where she did not wish to go," and "she was perfectly free to leave the petitioners when and if she so desired." *Id.* In contrast, here, a reasonable juror could find that H.K. was held against her will where Ingram took her phone, slapped her in the face, threatened her with what she thought was a gun, forcibly raped her, and continued to drive her away from her car for about an hour after the rape, while she was scared and plotting a way to escape. *See, e.g.*, *United States v. Wesson*, 779 F.2d 1443, 1444 (9th Cir. 1986) (per curiam) ("[A]lthough she may have agreed initially, she testified she later wanted to go home and told the defendant of her desires. She testified she continued on the journey despite being raped and beaten because she was terrified of the consequences if caught trying to escape.").

Ingram also argues at length his theory of the case that H.K. fabricated the rape and that the evidence showed that Ingram and H.K. engaged in consensual sexual activity. He highlights that H.K. did not claim she was raped in her 911 call, that H.K. hugged him before she went inside the Pilot station, and that H.K.'s sister told her to do what she had to do to get out of the situation. And he argues that his own actions at the Pilot and afterwards were not indicative of criminal activity. These arguments largely depend on credibility determinations, in particular on whether H.K.'s testimony was credible, and how much weight to give to the evidence. Ingram made these same arguments to the jury, and they were rejected. Because "[i]t is not this Court's role to reweigh the evidence or to reevaluate the credibility of witnesses," *United States v. Eaton*, 784 F.3d 298, 305 (6th Cir. 2015), this argument is unavailing.[5]

---

[5] Ingram's brief is unclear as to whether he is challenging the sufficiency of the evidence that H.K. was "willfully transported in interstate or foreign commerce, . . . or the offender travel[ed] in interstate or foreign commerce

Because the government presented sufficient evidence that Ingram inveigled H.K. and held her for the purpose of sexually assaulting her, Ingram's sufficiency challenge fails.

## III.

For the reasons set forth above, we affirm the district court's judgment.

---

or use[d] the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a). The jury found this element was met because Ingram "willfully transported H.K. without H.K.'s consent in interstate commerce by transporting H.K. from Michigan to Ohio," and because Ingram "used a semi-trailer truck, a means, facility or instrumentality of interstate or foreign commerce." R. 59, PID 1357. Because the government presented evidence that Ingram inveigled H.K. and drove her across state lines in a semi-trailer truck used to haul goods in interstate commerce, and Ingram presents no developed argument explaining why this evidence was not sufficient, we decline to disturb the jury's findings. *See Small*, 988 F.3d at 251-52.